Angel DIAZ, Denise L. Motley, and Reynaldo Coholo, Plaintiffs,

v.

Sheldon SILVER, in His Official Capacity as Speaker of the House For the Assembly; Joseph L. Bruno, in His Official Capacity as President Pro Tem and Majority Leader of the Senate of the State of New York; George E. Pataki, in His Official Capacity as Governor of the State of New York; and Owen T. Smith, Evelyn J. Aquila, and Helena M. Donahue, in Their Official Capacities as Commissioners of the Board of Elections of the State of New York; and John Does 1 Through 50, the Names of Such Defendants Being Fictitious and Unknown to Plaintiffs, and Referring to Those Persons Who are Responsible in Their Official Capacities For the Enforcement of the Legislation That Created New York's Federal Congressional Districts; Defendants.

Civil Action No. CV–95–2591.

United States District Court, E.D. New York.

July 17, 1996.

C. Daniel Chill, Graubard, Mollen, Horowitz, Pomeranz & Shapiro, New York City, for Defendant Sheldon Silver.

Joel Graber, Assistant Attorney General, NYS Department of Law, New York City, for Defendants George E. Pataki, Joseph L. Bruno and the Board of Elections of the State of New York.

Juan A. Figueroa, Arthur A. Baer, Kenneth Kimerling, Puerto Rican Legal Defense and Education Fund, Inc., New York City, for Defendants–Intervenors Margarita Lopez and Luis Garden Acosta.

Elizabeth R. OuYang, Asian American Legal Defense and Education Fund, New York City, for Defendants–Intervenors Peter Lau and Jack Kuo Wei Tchen.

Paul Wooten, Brooklyn, NY, for Defendants–Intervenors Representatives Nydia Velàzquez and Major R. Owens, et al.

Rep. Carolyn B. Maloney, New York City, Defendant–Intervenor Pro Se, Member of Congress.

Before McLAUGHLIN, Circuit Judge, and JOHNSON and TRAGER, District Judges.

*MEMORANDUM AND ORDER*

PER CURIAM:

In June 1995, plaintiffs, Latino and African–American residents and voters brought this action alleging that the Twelfth Congressional District (12th CD), in which they reside, was unconstitutionally drawn.

Relying upon a series of Supreme Court cases beginning with *Shaw v. Reno*, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) and continuing with *U.S. v. Hays*, —— U.S. ——, —— – ——, 115 S.Ct. 2431, 2433–34, 132 L.Ed.2d 635 (1995); *Miller v. Johnson,* —— U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d

Robert D. Popper, New York City, for plaintiffs.

Delco L. Cornett, New York City, Plaintiff–Intervenor Pro Se.

762 (1995); *Bush v. Vera,* 1996 WL 315857 (June 13, 1996), and *Shaw v. Hunt,* —— U.S. ——, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996), plaintiffs allege that "racial segregation was, in fact, the purpose of drawing the Twelfth Congressional District [ (12th CD) ]. This effort to segregate the races for the purposes of voting shows no regard for traditional districting principles, and is attempted without a sufficiently compelling justification or state interest." Compl. at ¶¶ 52–53. The complaint concludes:

> New York State's adoption of the [1992 Congressional Redistricting] Plan and the 12th CD causes plaintiffs to be treated differently under the law on account of race, and so violates plaintiffs' Fourteenth Amendment constitutional right to the equal protection of the laws. New York State's adoption of the ... Plan violates plaintiffs' Fifteenth Amendment constitutional right to vote, free of abridgment on account of race, in a color-blind electoral process.

*Id.* at ¶¶ 66–67. Consequently, plaintiffs seek to enjoin any election under the present lines because the mere holding of an election under such an improperly drawn, racially based, districting plan is a constitutional violation which irreparably harms them.

### Background

In 1992, when the New York State Legislature failed to enact a Congressional redistricting plan based upon the 1990 Census, a lawsuit was brought in Supreme Court State of New York, Kings County, requesting that the court draw up a Congressional redistricting plan in light of the Legislature's failure to do so. *Reid v. Marino,* Index No. 9567–92 (Kings Co.1992), Ex. X of defendant-intervenors. The state court appointed three referees who then developed a districting plan which created the 12th CD. The State Supreme Court adopted the referees' plan, Final Report of Referees, Ex. C of defendant-intervenors, which it found to be "complete and valid under the Constitution of the United States and the State of New York as well as the Federal Voting Rights Act." *Reid v. Marino,* Ex. X at 3–4.

In their report, the referees explicitly stated that, when they were drawing up their plan, compliance with the Voting Rights Act ("VRA") was the highest goal after meeting the one person/one vote requirement. Referees' Report, Ex. C at 15. In their own words, the referees used the following criteria: "The one person, one vote standard of the United States Constitution; the Voting Rights Act of 1965; public interest criteria including contiguity, compactness, traditional boundaries in the State, communities of interest, and political fairness." *Id.* The referees determined: "Federal law mandates that Congressional districting plans must meet two primary requirements: the one person, one vote standard and the racial fairness standard." *Id.* at 17. The other criteria were described as secondary which "may" be considered. *Id.* at 24. Indeed, it was made clear that compactness was a weak consideration, at best. At a hearing conducted by the state court, Professor Alan Gartner, the Director of Research for the Graduate School and University Center, the City University of New York who was an expert retained to aid the referees, explained that "looking at the concentration maps, if you're not bound by *antiquated notions of compactness* ... an additional Hispanic seat ... [the] so-called 'Tri–County Seat' " can be created. June 2 Tr., Pltff. Ex. 6, at 123 (emphasis added).

Furthermore, the referees provided a district by district analysis of the racial composition of the minority districts. *Id.* at 34–40. For each district, the only characteristic discussed is the voters' race. *See also* Pltff. Ex. 5, chart entitled "Congress plan state racial breakdown." The referees described the 12th CD as follows:

> [O]ur Plan includes a newly created tri-county Hispanic district which although not aesthetically compact, was drawn in a manner to ensure an effective concentration of Hispanic voters that can elect the candidate of their choice.

Referees' Report, Ex. C at 26. And, in a footnote, the referees explained how they gathered the racial data and utilized the information in a computer program.

Based upon the Board of Elections registration list, using surname dictionaries to identify Hispanic and non-Hispanic Asians, and then census-based estimates to identify non-Hispanic blacks and whites, an estimate of registration by race for New York City was developed. This was loaded on the REAPS system. Using REAPS, the referees not only were able to see how various minority districts (and the various racial and language groups within the same district) compared at the total population and voting age population levels, but also at the estimated registered voter level. In this manner, the Referees could 'compensate' those districts in which large numbers of protected minorities with low citizenship resided, such as ... Hispanics in Northern Manhattan and Central Queens.

*Id.* at 33, n. 32.

It is of significance that a special master who was at the same time drawing up a redistricting plan for a federal court followed the same criteria in the same order of priorities as the referees—complying with his understanding that the VRA had priority over traditional districting criteria. Special Master Report, Ex. B of defendant-intervenors, at 37. The plan he created also included a tri-county majority-Latino Congressional district similar to the 12th CD. *See Puerto Rican Legal Defense & Education Fund (PRLDEF) v. Gantt,* 796 F.Supp. 681 (E.D.N.Y.1992).[1]

Both the special master and the referees created a plan that had seven minority districts. Referees' Report, Ex. C, at 51. The federal court ordered that unless the New York State Legislature adopt a plan approved by DOJ, then its plan would be used for the 1992 election. Thus, acting under a time constraint, the Legislature, which openly acknowledged a concern for incumbents, adopted the referees' plan. Once signed into law by the Governor on June 11, 1992, the legislation together with the Referees' Re-

port was sent to the Department of Justice (DOJ) for pre-clearance pursuant to the Voting Rights Act. DOJ subsequently pre-cleared the redistricting plan. *See* Ex. B of Graber Decl. Elections have been held under this plan since November 1992. And, since then, a Latina woman, an intervenor in this action, Nydia Velasquez, has been elected to represent the 12th CD.

**Discussion**

As plaintiffs recognize, a preliminary injunction enjoining an election is an extraordinary remedy involving the exercise of a very far-reaching power. Pltff. Reply Br. at 2. Here, caution is especially necessary because if an injunction is granted at this time, a federal court would be interrupting a state's election process. The Supreme Court has repeatedly held that "redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to preempt." *Wise v. Lipscomb,* 437 U.S. 535, 539, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978).

■ Also relevant here is the Second Circuit's statement in *Plaza Health Lab., Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989).

[W]here the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous fair-ground-for-litigation standard and should not grant the injunction unless the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim.

*See Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir.1996) (same); *Able v. United States,* 44 F.3d 128, 131 (2d Cir.1995) (same). Thus, in order to prevail on their request for preliminary injunctive relief, plaintiffs must demonstrate that (1) they will suffer irreparable injury if relief is not granted; (2) there is a substantial likelihood of success

---

1. The only difference between the referees' and the special master's priorities occurred when the state referees considered incumbency third, after one person one vote and the VRA, Referees' Report, Ex. C, at 28–29. The special master, on the other hand, stated in his report: "In drafting

my Plan, I was not driven by the concept of preserving seats of incumbents, and the concerns of incumbency were not included in my hierarchy of guiding principles." Special Master Report, Ex. B of defendant-intervenors, at 34.

on the merits; and (3) the public interest favors issuance of the injunction. *Regents of the University of California v. American Broadcasting Cos., Inc.,* 747 F.2d 511, 515 (9th Cir.1984). *See also Campbell Soup Co. v. Giles,* 47 F.3d 467 (1st Cir.1995); *Westlands Water District v. Natural Resources Defense Council,* 43 F.3d 457, 459 (9th Cir. 1994); *Marshak v. Branch,* 1992 WL 360092 (4th Cir.1992); *Tate v. Frey,* 735 F.2d 986 (6th Cir.1984). *See also Yakus v. United States,* 321 U.S. 414, 440–441, 64 S.Ct. 660, 674–675, 88 L.Ed. 834 (1944) (although the Supreme Court did not specifically review the elements required to grant a preliminary injunction, it noted that an injunction should not be granted if it would harm the public interest, even when an irreparable harm to plaintiff is found.)

■ Irreparable harm means injury for which a monetary award cannot be adequate compensation. *Studebaker Corp. v. Gittlin,* 360 F.2d 692, 698 (2d Cir.1966). Plaintiffs argue that they "have had to endure two elections under a set of districts [sic] lines that are all but certain to be declared unconstitutional." Pltff. Reply at 43. They also maintain that they are "very likely to succeed on the merits," *id.* at 14, as race was the predominant factor that determined the plan which the New York State Legislature adopted.

### (1)

■ We assume for present purposes that the plaintiffs have shown both a likelihood of success on the merits and that a monetary award would not be an adequate substitute. Nevertheless, the preliminary injunction ought not to be granted as it would "adversely affect the public interest ... [even] though the postponement [of an injunction] may be burdensome to the plaintiff[s]." *Yakus v. United States,* 321 U.S. 414, 440, 64 S.Ct. 660, 675, 88 L.Ed. 834 (1944). *See also Caribbean Marine Services Co. v. Baldrige,* 844 F.2d 668 (9th Cir.1988) (directing a district court to consider the whether the public interest would be advanced when issuing an injunction). Specifically, in the context of redistricting, the Supreme Court in *Reynolds*

*v. Sims,* 377 U.S. 533, 585, 84 S.Ct. 1362, 1393, 12 L.Ed.2d 506 (1964) has written:

> [U]nder certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles.

Thus, even where an existing districting scheme was found invalid, the Supreme Court maintained that the state need not interfere with election machinery which was already "in gear." *Roman v. Sincock,* 377 U.S. 695, 709–710, 84 S.Ct. 1449, 1457–58, 12 L.Ed.2d 620 (1964).

In arguing against the grant of any relief, the defendants and defendant-intervenors maintain that logistically it would be too difficult, if not impossible, to create a new redistricting plan in the few months between now and the Fall elections. Where "the qualifying period for candidates in the 1994 election has ended and the candidates have begun to organize their campaigns, to raise funds, and to spend those funds in reliance on the present districting scheme," a Florida court denied a preliminary injunction motion. *Johnson v. Smith,* TCA 94–40025–WS (N.D.Fl.) Order denying plaintiffs' motion for preliminary injunction, dated 7/18/94 at 3. Interference by a court now may well create considerable confusion, inconvenience and uncertainty among voters, candidates and election officials. *See also Johnson v. Miller,* CV–194–008, Order dated 4/19/94 at 3. Still, while the burden on election officials and candidates are certainly considerations, it would be difficult to accept them as controlling if there were in fact an effective and immediately available remedy to a constitutional violation. Such, however, does not appear to be the case here.

Here, plaintiffs propose two possible remedies: either an at-large election in the sixteen New York City districts or an election based on a court-ordered plan. There are serious difficulties with both of these proposals. An at-large election is not only counter to our tradition, but it is uncertain whether the outcome of such an election would be consistent with the VRA. *Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982) (fearing unconstitutional dilution of voting rights from an at-large system, the Supreme Court affirmed the district court's invalidating a county election system); *City of Richmond v. United States,* 422 U.S. 358, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975) (finding that an at-large election must be considered by DOJ in order to assure it meets the qualifications of the VRA); *Perkins v. Matthews,* 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971) (holding that annexations by a city are subject to § 5 of the VRA preclearance because increasing the number of eligible voters dilutes the weight of the votes of those to whom the franchise was limited before the annexation, and the right to vote may be denied by dilution). The alternative of a court-ordered plan presents two problems. One, it ignores Supreme Court precedent requiring that federal courts give deference to state legislatures by at least giving them an initial opportunity to draft a constitutionally valid plan. *See Miller v. Johnson,* —— U.S. ——, ——, 115 S.Ct. 2475, 2488, 132 L.Ed.2d 762 (1995) and *Reynolds v. Sims,* 377 U.S. 533, 585, 84 S.Ct. 1362, 1393–94, 12 L.Ed.2d 506 (1964) *infra.* Two, at this point in time, it would appear most unlikely that a proper plan can be drafted by this court in sufficient time to avoid delaying at least the September primary.

Not only must experts be retained and given appropriate guidelines, there must also be a reasonable opportunity for review and comment by interested parties and DOJ as well as time for any necessary revisions that result from this process. It is also clear, if plaintiffs are correct in their claims, that the creation of a new districting plan must start anew. Both the special master's plan and the referees' plan used the same criteria which made race the critical criterion after equal population and only considered traditional districting principles last. As previously stated, the referees' plan established the following hierarchy: "The one person, one vote standard of the United States Constitution; the VRA; public interest criteria including contiguity, compactness, traditional boundaries in the State, communities of interest, and political fairness." Referees' Report, Ex. C at 15. In federal court, the special master explained: "After complying with constitutional and VRA requirements, a redistricting plan may properly consider a 'wide array of secondary or equitable criteria.'" Special Master's Plan, Ex. B of defendant-intervenors, at 29. In addition, the experts retained by the referees and the special master used the same computer system which was programmed to consider race above traditional districting criteria. Referees' Report, Ex. C at 33, n. 32. Professor Gartner testified before the state court about the method in which computers were used to create the districts stating:

> [O]ne of the things that the computer can do is it can produce maps which translate Census numbers into geography, showing you, for example, concentrations of particular population groups. And so, we produced a set of maps that show the concentrations of the three so-called "protected classes" in New York City; in Census language: "Non–Hispanic blacks, non-Hispanic Asians, and Hispanics."

> In effect those concentrations tell you how to do the districting, per the VRA. And, the order in which I will describe these districts, in effect, reflects our using those concentrations as a basis.

June 2, 1992 Tr., Pltff. Ex. 6, at 111. On June 5, 1992, he further testified that the computer was programmed to easily identify racial concentrations: "The richer the shade (indicating) ... the more intensive the [racial] population group." June 5, 1992 Tr., Pltff. Ex. 7, at 234. Neither the plaintiffs nor the defendants or defendant-intervenors have indicated that an alternative computer program for New York is available.

Two of the defendants have suggested a possible remedy that technically might be accomplished in a brief time. It would involve redistricting the 12th CD and the dis-

tricts immediately adjacent to the 12th CD. The difficulty with this proposal is that it might well create a new VRA § 2 violation since such a limited redistricting may well result in a plan where minority candidates have no reasonable opportunity of being elected. Thus, in a city where if traditional criteria other than incumbency are employed, there could certainly be two and possibly even three geographically compact majority-Latino districts, the net effect of this approach would leave New York with only one majority-Hispanic district, the Sixteenth Congressional District. Senate Tr., Ex. E of defendant-intervenors, at 37. Thus, the defendants who offered this proposal have not shown that compliance with the valid requirements of §§ 2 and 5 of the VRA can be done on the basis of changing only the districts bordering the 12th CD. *Thornburg v. Gingles,* 478 U.S. 30, 50–51, 106 S.Ct. 2752, 2766–67, 92 L.Ed.2d 25 (1986).

In sum, because there has been no showing that a redistricting of only the 12th CD and the Congressional districts adjacent to it would be valid under the VRA, and because there does not appear to be any alternative plan readily available, the harm to the public in delaying either the primary or the general election or even changing the rules as they now stand substantially outweighs the likely benefit to the plaintiffs of granting a preliminary injunction at this time.

### (2)

Our decision here is in accord with the view that other courts have taken in similar situations especially where no alternative districting plan exists. In *Vera v. Richards,* 861 F.Supp. 1304, 1351 (S.D.Tex.1994), *aff'd Bush v. Vera,* — U.S. ——, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996), a three-judge panel, after finding the redistricting plan unconstitutional, on September 2, 1994, ordered that the Texas Legislature develop and implement by March 15, 1995 a new Congressional redistricting plan which conformed to the court's opinion, but did not require a stay in the November 1994 elections or a change to the districts. In fact, the three-judge panel denied relief during not only the 1994 election but the 1996 election as well.

Similarly, in this court in *Ashe v. Board of Elections in the City of New York,* 1988 WL 68721 (E.D.N.Y. June 8, 1988), a three-judge panel considering a VRA violation resulting from the change by the Board of Elections in the City of New York which purged names from the list of registered voters on the eve of a closed period for registration in the 1988 elections found that "plaintiffs have demonstrated a likelihood of showing ... irreparable injury to plaintiffs ... and ... immediate harm to plaintiffs. ..." Nevertheless the panel denied a preliminary injunction after "balanc[ing] such harm against the public interest in maintaining an orderly system of registration and in holding a primary election on a regularly scheduled date."

Again, in a district court in the Northern District of California, *Cardona v. Oakland Unified School District,* 785 F.Supp. 837, 842–43 (1992), a preliminary injunction was denied four months prior to the primary election, citing *Reynolds v. Sims,* 377 U.S. 533, 585, 84 S.Ct. 1362, 1393–94, which permits a court "to consider the proximity of a forthcoming election and the mechanics and complexities of state election laws ..." *Id.* at 842.

And, in *Watkins v. Mabus,* 771 F.Supp. 789, 805 (S.D.Miss.1991), *aff'd in part and vacated in part as moot,* 502 U.S. 954, 112 S.Ct. 412, 116 L.Ed.2d 433 (1991), a three-judge court in Mississippi found that "where as here, the possibility of corrective relief at a later date exists, even an established VRA violation does not in and of itself merit a preliminary injunction." Consequently, the court in Mississippi denied a preliminary injunction that would have enjoined the primary and general elections for the Mississippi Legislature and ordered elections to be conducted under existing law, even though it violated § 2 of the VRA. Thus, on August 9, 1991, the court ruled: "Accordingly, although the legislative districts under the 1982 plan are doubtless unconstitutionally malapportioned for a full four-year term of office, this court, exercising its equitable powers, holds that under the facts in this case, including the imminent elections, they may be constitutionally utilized for interim relief." *Id.* at 807. In its explanation for why the court

took such a course, it emphasized that the Mississippi Legislature should have the ability to create a plan which would adequately consider the traditional criteria. *Id.*

An Alabama three-judge panel found the preliminary injunction criteria satisfied in a VRA challenge to five counties' at-large voting plans, but on May 28, 1996, denied an injunction for the following November's elections because "even if it were clear that all of the counties should be required to adopt single-member districts, it would be unfair and infeasible to require them to do so by June." *Dillard v. Crenshaw County*, 640 F.Supp. 1347, 1362 (M.D.Ala.1986). The court explained that each county should devise its own new plan and that because the "election systems may all have to be completely reorganized, there can be no absolute assurance that new plans will be fully implemented before January 1987, when some of the present commissioners' terms will end." *Id.* at 1362–63.

As a Massachusetts federal court stated: "When the massive disruption to the political process of the Commonwealth is weighed against the harm to plaintiffs of suffering through one more election based on an allegedly invalid districting scheme, equity requires that we deny relief." *Mac Govern v. Connolly*, 637 F.Supp. 111, 116 (D.Mass. 1986).

(3)

Finally, we take seriously the Supreme Court's admonition that federal courts should, if at all possible, give the Legislature the first opportunity to draft a constitutionally valid redistricting plan. As Justice Kennedy stated in *Miller v. Johnson*, —— U.S. ——, ——, 115 S.Ct. 2475, 2488, 132 L.Ed.2d 762 (1995) (citations omitted):

Federal court review of districting legislation represents a serious intrusion on the most vital of local functions. It is well settled that 'reapportionment is primarily the duty and responsibility of the State.'

Similarly, in *Voinovich v. Quilter*, 507 U.S. 146, 156, 113 S.Ct. 1149, 1156–57, 122 L.Ed.2d 500 (1993), the Supreme Court stated: "It is the domain of the States, and not the federal courts, to conduct apportionment

in the first place." And, in *Wise v. Lipscomb*, 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978), the Court further admonished that a court's involvement in reapportionment is a last resort after the Legislature has an opportunity to create its own plan. Specifically, the Court stated: "Legislative bodies should not leave their reapportionment tasks to the federal courts, but when those with legislative responsibilities do not respond, or the imminence of a state election makes it impractical for them to do so, it becomes the unwelcome obligation of the federal court to devise and impose a reapportionment plan pending later legislative action." *Id.*

Thus, the strong public interest against interfering with the Legislature's task of redistricting weighs heavily against an injunction. These precedents make it clear that the New York State Legislature should have the first opportunity to create, if necessary, a new redistricting plan.

**Conclusion**

For the reasons stated, the motion for a preliminary injunction is denied.