**Gloria T. COLEMAN and The Coalition for the Empowerment of People of African Ancestry, on behalf of its African–American members who are registered voters, Plaintiffs,**

v.

**THE BOARD OF EDUCATION OF THE CITY OF MOUNT VERNON; M. Grace Anker, Donald P. Augustine, Joseph A. Carvalho, Benjamin Consolazio, Anthony M. Mosca, Leonard Sarver and Maryann Tartaglia, in their capacities as the Trustees of the Board of Education of the City of Mount Vernon; and Elia C. DeBenedictus, in his capacity as Clerk of the Board of Education of the City of Mount Vernon, Defendants.**

No. 97 Civ. 2302 (BSJ).

United States District Court, S.D. New York.

May 1, 1997.

Sullivan & Cromwell by Richard H. Klapper, Michael E. Swartz, Andrew Rotstein & Mark Coyne, New York City, for Plaintiffs.

D'Andrea & Goldstein by Vincent D'Andrea & Robert Goldstein, Scarsdale, NY, Donoghue, Thomas, Auslander & Drohan by Lawrence W. Thomas, of counsel, Scarsdale, NY, Hogan & Hartson L.L.P. by John Borkowski, on the brief, Washington, DC, for Defendants.

### Opinion and Order

JONES, District Judge.

Plaintiffs Gloria Coleman and the Coalition for the Empowerment of People of African Ancestry ("CEPAA") ask this Court to enjoin the Board of Education of Mount Vernon ("the School Board"), its Trustees, and its Clerk from violating state and federal law during the upcoming May 6, 1997 election for five of nine Trustee seats on the School Board. Plaintiffs also ask this Court to issue an order, pursuant to 42 U.S.C. § 1973a, authorizing the appointment of federal examiners to monitor the election.

After considering the parties' submissions and the testimony taken over three days, and for the reasons discussed below, the Court denies plaintiffs' requests.

### FACTS

According to plaintiffs, the City of Mount Vernon has a population of approximately 70,000, of whom approximately 55% are African–American and 25% are white. Hispanic and other minority groups make up the remaining 20%. Verified Complaint ("Verif. Compl.") ¶¶ 10, 14.

Historically, voters in Mount Vernon have elected African–American candidates in municipal, county, and state elections. Specifically, African–American candidates have prevailed in races for Mayor, Comptroller, the Board of Estimate, the City Council, Westchester County positions, the New York State Assembly, the New York State Senate,

and the School Board. Verif. Compl. ¶ 12. Plaintiffs contend, however, that the School Board remains a "bastion of white power." Plaintiffs' Memorandum of Law, dated April 1, 1997, 4.

CEPAA was founded in 1993 as a volunteer organization of African–American residents from Mount Vernon interested in education issues. Among other activities, CEPAA endorses African–American candidates in various School Board elections. Verif. Compl. ¶ 4. Plaintiff Gloria Coleman chairs CEPAA's Civil Rights and Political Action Committee. Aff. of Gloria T. Coleman ("Coleman Aff."), dated March 31, 1997, ¶ 1.

#### The School Board Election Process

As Clerk of the School Board, Elia DeBenedictus ("DeBenedictus") supervises School Board elections; his staff is responsible for administering them. Aff. of Elia DeBenedictus ("DeBenedictus Aff."), dated April 14, 1997, 2; Tr. 127.[1] DeBenedictus and several School Board Trustees are members of the Italian Civic Association ("ICA"), an organization in Mount Vernon that endorses Italian–American candidates for the School Board. Tr. 132. The ICA may have once, during the 1970's, endorsed an African–American candidate; CEPAA has never endorsed a white candidate. Tr. 56, 133.

Although voters are assigned to specific school board election districts,[2] the voting for School Board elections is at-large. Tr. 213. In 1996, a total of 10,211 people voted in the School Board election. In 1995, the figure was 6,571. Pl.Ex. 3.

The School Board's voter register is based upon the Westchester County Board of Elections Registry ("County Registry"). The School Board prepares a separate "buff card" for each voter on the County Registry and places these cards in separate notebooks, one for each school election district. Tr. 148, 206. A buff·card contains a voter's name,

---

1. "Tr." refers to the transcript recording the preliminary injunction hearing in this case held on April 18, 1997, April 28, 1997, and April 29, 1997.

2. According to plaintiffs, there are 27 school election districts, and 65 general election districts. Tr. 387.

address, and signature.[3] *See* Def. Ex. A (sample buff card).

Before a person can vote at a polling site in any particular year, that person's buff card must first be located by a poll inspector. The person must then sign his or her buff card, and the signature is compared to that already on the buff card. Tr. 224. If the signature matches, the person proceeds to vote using the voting machines.

If no buff card is found, the voter may vote by using paper ballots—"affidavit ballots"—that are kept at the polling sites. Tr. 237; Affidavit of Frank Luiso ("Luiso Aff."), dated April 14, 1997, 4.

Alternatively, a voter may vote by absentee ballot obtained prior to election day. Voters receive absentee ballots if they (1) appear on the Westchester County Permanently Sick and Disabled ("PSD") List,[4] *see* Def. Ex. AA (PSD List), or (2) fill out an application requesting an absentee ballot and qualify to receive one.[5] Tr. 176–77, 231.

Each candidate is permitted to send two to three poll watchers of his or her choice to each polling site to observe the elections. These poll watchers also oversee the opening of absentee and affidavit ballots. N.Y. Educ. Law §§ 2611, 2035 (McKinney 1995).

*Plaintiffs' Claims*

Plaintiffs maintain that the School Board's electoral practices discourage or dilute the effect of minority voting. Specifically, they claim that the School Board elections are marked by: irrational election districts, inaccurate voting registers, the failure to send absentee ballots to minority voters, bias and inadequate assistance at southside[6] polling places, racist campaign appeals, an inade-

quate system for challenging voters' registration status, and failure to keep persons without official election functions from within 100 feet of polling places. At least some of these practices, plaintiffs allege, cause long lines and voter confusion, resulting in lost minority votes.

Despite these alleged irregularities—which plaintiffs maintain have existed for many years, Tr. 76, 79, 85–86, 403,—at least two African–American candidates were elected to the School Board prior to 1992, and CEPAA-backed candidates won four of the five open seats during the 1994 and 1995 elections. Tr. 25, 60; DeBenedictus Aff., 4–5.[7]

When CEPAA-backed candidates did not prevail in 1993, CEPAA unsuccessfully sought to stay the election results in state and municipal courts.[8] CEPAA then sought a stay of and challenged the results in an appeal to the New York State Commissioner of Education. In that appeal, CEPAA raised many of the same issues presented in this case, including long lines at polling places, improper administration of affidavit ballots, and inaccurate voting registers. *See* DeBenedictus Aff., Ex. A. The Commissioner denied CEPAA's application for a stay and dismissed its appeal, finding that the petitioners did not meet their burden of proof to establish facts upon which they sought relief. DeBenedictus Aff., 3 & Ex. A.

CEPAA did not challenge the 1994 or 1995 elections, in which CEPAA-endorsed candidates prevailed.

After the CEPAA-backed candidates lost their bids for election in 1996, CEPAA appealed to the Commissioner of Education in

---

3. This signature is put on the buff card the first time that a person votes in a School Board election. Affidavit of Frank Luiso ("Luiso Aff."), dated April 14, 1997, 3.

4. In 1996 there were 245 voters on the County's PSD list. Def. Ex. AA.

5. A person may be qualified to vote by absentee ballot if they are ill, hospitalized, or out of town on vacation, on business, or at school. Tr. 177–78.

6. According to plaintiffs, racial polarization in Mount Vernon manifests itself geographically. African–American voters reside primarily in the

southern portion of Mount Vernon ("southside"), as demarcated by the MetroNorth railroad tracks; white voters reside primarily in the northern section ("northside"). Verif. Compl. ¶ 10; Tr. 22, 50.

7. The number of Trustee seats available ranges from year to year. Elections were held for two positions in 1993, for three in 1994, for two in 1995, and for four in 1996. Tr. 252–259.

8. In 1993, the ICA-backed candidates each prevailed by a margin of over 440 votes. Pl.Ex. 8.

order to challenge the results.[9] The Commissioner denied CEPAA's initial application to stay the seating of the elected candidates; the Commissioner's final decision on the appeal is still pending. DeBenedictus Aff., Ex. D.

The plaintiffs now turn to federal court for relief. On April 1, 1997, they filed a Verified Complaint alleging violations of the Voting Rights Act, 42 U.S.C. § 1971 *et seq.*, the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Fourteenth and Fifteenth Amendments. The next day, plaintiffs moved for a preliminary injunction. A hearing began on April 18, 1997, but was halted on consent of all parties in order to pursue settlement efforts. When negotiations broke down, the hearing resumed on April 28, 1997 and concluded April 29, 1997.

## DISCUSSION

### I. *Standards for Granting a Preliminary Injunction*

In order to prevail in their request for preliminary injunctive relief, plaintiffs must demonstrate (1) irreparable harm, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Bridgeport Coalition for Fair Representation v. City of Bridgeport,* 26 F.3d 271, 274 (2d Cir.1994) (citing *Jackson Dairy v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979)). A preliminary injunction is an extraordinary remedy, and should not be routinely granted. *See Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986).

The deprivation or dilution of voting rights constitutes irreparable harm. *See Puerto Rican Legal Defense & Education Fund, Inc. v. City of New York,* 769 F.Supp. 74, 79 (E.D.N.Y.1991); *see also Reynolds v. Sims,* 377 U.S. 533, 561–62, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ("[T]he right of suffrage is a fundamental matter in a free and democratic society ... any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized").[10]

There is authority that parties seeking a preliminary injunction in the context of election challenges must meet the more rigorous "likelihood of success" standard. *See Able v. United States,* 44 F.3d 128, 130–31 (2d Cir. 1995) (citing *Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989)) (more rigorous standard applies where moving party seeks to stay governmental action taken in the public interest pursuant to a statutory scheme); *Diaz v. Silver,* 932 F.Supp. 462, 465 (E.D.N.Y.1996) (applying "likelihood of success" standard); *Leblanc–Sternberg v. Fletcher,* 763 F.Supp. 1246, 1249 (S.D.N.Y.1991) (same).[11]

The Court need not reach the issue of which standard applies, however, as plaintiffs have not sufficiently shown either likelihood of success on the merits or sufficiently serious questions going to the merits of their claims.

### II. *The Voting Rights Act*

In order to maintain an action under § 2 of the Voting Rights Act, plaintiffs must prove that (1) a "standard, practice, or procedure" (2) impairs the ability of minority voters to participate equally in the political pro-

---

9. In 1996, ICA-backed candidates won all four open seats. The CEPAA-endorsed candidate who received the most votes trailed the winners by a margin of 194. Pl.Ex. 3.

10. Defendants contend that plaintiffs created their own irreparable harm by delaying commencement of this suit. Delays in filing have precluded injunctive relief only when filed on the eve of elections, however. *Puerto Rican Legal Defense,* 769 F.Supp. at 79 (citing *Perkins v. Matthews,* 400 U.S. 379, 396, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971)) (granting temporary restraining order enjoining petitioning process five days before election).

The School Board election is only days away. Plaintiffs clearly have been aware of the existence of their claims well before they filed this suit; their Complaint replicates many of the issues raised in prior municipal and state challenges. Nevertheless, plaintiffs' allegation of voting rights violations demonstrates irreparable harm.

11. Plaintiffs argue that the School Board elections have not been conducted pursuant to statutory schemes or in the public interest, and are not the result of the full play of democratic processes.

cess and to elect candidates of their choice. 42 U.S.C. § 1973(b); *Thornburg v. Gingles,* 478 U.S. 30, 47, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986); *United States v. Jones,* 57 F.3d 1020, 1023 (11th Cir.1995). No showing of discriminatory intent is required to prove a violation of § 2. *Chisom v. Roemer,* 501 U.S. 380, 384, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991).[12]

■ With regard to the first factor in the § 2 analysis, a "standard, practice, or procedure" must be more than a "run-of-the-mill mistake" that one would expect in the normal course of an election. *Jones,* 57 F.3d at 1023.

■ In considering the second factor of the analysis, a court must look at the "totality of circumstances," and engage in a "searching practical evaluation of the past and present reality." *Gingles,* 478 U.S. at 45. *See also National Association for the Advancement of Colored People, Inc. v. Niagara Falls,* 65 F.3d 1002, 1008 (2d Cir.1995). In doing so, the court should consider the factors set out by the Senate Judiciary Committee in the Senate Report accompanying the Voting Rights Act 1982 amendments.[13] *Johnson v. De Grandy,* 512 U.S. 997, 114 S.Ct. 2647, 2656 n. 9, 129 L.Ed.2d 775 (1994); *Niagara Falls,* 65 F.3d at 1007–08. There is

no requirement that any particular number of factors be proved or that a majority of them point one way or the other. *Gingles,* 478 U.S. at 45. Rather, the test is intended to be a flexible, fact-bound, intensely local appraisal of any challenged practices. *Uno v. City of Holyoke,* 72 F.3d 973, 980 (1st Cir.1995).

The Court now considers the various practices or procedures that plaintiffs contend impact on minority individuals' access to and participation in the electoral process.

### A. Challenged Practices or Procedures[14]

#### 1. School Election Districts

■ Plaintiffs contend that minority voters have experienced considerable confusion in finding their proper polling places because the School Board organizes its elections by different voting districts than those employed in general elections.[15]

While state law requires that districts be coterminous with general election districts "if circumstances permit," the law also states that "if practicable, there shall be a schoolhouse in each election district." New York Educ. Law § 2604 (McKinney 1995). The

---

**12.** Such a showing is required, however, for plaintiffs, § 1983 and constitutional claims. *See City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) (constitutional claims require proof of discriminatory intent); *Gold v. Feinberg,* 101 F.3d 796, 800 (2d Cir.1996) (same, for § 1983 claims).

In light of the Court's conclusion as to plaintiffs' claims under the Voting Rights Act, the Court need not separately address plaintiffs' other claims, which require more proof from the plaintiffs.

**13.** These factors include:
- extent of any history of official discrimination in the political subdivision touching the right of minorities to register, vote or participate in the democratic process;
- extent to which voting in the political subdivision is racially polarized;
- extent to which the political subdivision has used voting procedures that may enhance the opportunity for discrimination against the minority group;
- whether members of the minority group have been denied access to the candidate slating process;
- extent to which members of the minority group in the political subdivision bear the effects of discrimination in education, em-

ployment, and health, which hinder their ability to participate effectively in the political process;
- whether political campaigns have been characterized by overt or subtle racial appeals;
- extent to which members of the minority group have been elected to public office in the jurisdiction;
- whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and
- whether the policy underlying the political subdivision's use of the challenged practice is tenuous.

*Niagara Falls,* 65 F.3d at 1007–08 (citing Senate Report).

**14.** Unless otherwise noted, plaintiffs' proof derives from the May, 1996 School Board election.

**15.** Plaintiffs originally sought a redrawing of the districts but no longer request this relief, recognizing that compliance with such a request at this late date would be logistically difficult and impracticable, leading to even more voter confusion on election day. *See Diaz,* 932 F.Supp. at 466 (refusing to create a new redistricting plan several months prior to election).

School Board attempts to adhere to both standards, and has used the current school election polling places for the past several years.

Further, in accordance with state law, the School Board publishes a list of polling places in a local daily newspaper four times before the School Board elections are held. Affidavit of Patricia DeNisco ("DeNisco Aff."), dated April 14, 1997, 4; Tr. 244–45. The Board also provides each polling place with maps and street guides that "convert" general election districts to school board election districts.[16] Tr. 159, 237, 244.

In support of their confusion argument, plaintiffs offer the statements [17] or testimony of only four voters who claimed that *they themselves* were confused over where to vote.[18] While three of these four people initially went to the wrong polling place, they ultimately voted by a paper affidavit ballot. Coleman Aff., Ex. H (Statement of Deloris Blackwood); Tr. 99–102, 481. The fourth voter testified that she went home after unsuccessfully attempting to vote at two schools.

Moreover, plaintiffs offer no proof demonstrating that minority voters were any more confused than non-minority voters subject to the same districting system. As such, plaintiffs offer no evidence that the School Board's districting system disadvantages only minority voters.

2. *Voting Registers and Use of Buff Cards*

■ Plaintiffs also attack the School Board's use of "buff cards" as their voter

register, rather than working directly from the County Registry.

Prepared by the School Board's Board of Registry,[19] the buff cards are the School Board's voter register. Tr. 158; Luiso Aff., 4.

When preparing the buff cards, the Board of Registry works directly from the County Registry. Tr. 148, 206. The Board of Registry updates the buff cards each year in December and April, when the County sends an updated County Registry. Tr. 202. In doing so, the Board of Registry prepares new cards for newly registered voters, and removes the cards of those voters no longer qualified to vote. Tr. 199, 205–09.

Buff cards are not prohibited by New York law. *See* N.Y.Educ. Law § 2609(2) (McKinney 1995) (stating only that a school board may use registers to validate voter signatures). In fact, they provide a useful way to collect a voter's signatures for comparison at the polls. *See* Tr. 211.

Plaintiffs argue that the buff cards are not properly updated; they claim both that additional cards are not prepared for newly registered voters and that the cards of voters no longer registered are not removed.

One possible effect of this practice, plaintiffs argue, is that people not registered may vote using out-dated buff cards.

In support of their challenge to the buff card system, plaintiffs offer evidence that 1148 buff cards existed for voters no longer qualified to vote in the 1996 election. *Compare* Pl.Ex. 3 with Pl .Ex. 10.[20]

---

**16.** Although plaintiffs claim that maps were not displayed at southside polling places, they offer only the testimony of Gloria Coleman, who said she did not see a map displayed at the Graham school, Tr. 381, and Gary Simmons, who said he did not remember seeing a map displayed at his polling place. He did state, however, that as a poll watcher he was provided with a book containing a map to demonstrate voters' proper polling places, and that he used this map to assist voters.

**17.** Many of the voter statements submitted by plaintiffs are not sworn affidavits, but are notarized declarations.

**18.** Plaintiffs also offer testimony from Gloria Coleman, Reverend W. Franklyn Richardson,

and Gary Simmons that other minority voters were observed to be confused over where to vote. Significantly, none of these witnesses could testify as to who these voters were, or whether they ultimately voted.

**19.** The Board of Registry is composed of four members; currently, at least one member is African-American. Tr. 199–201.

**20.** Plaintiffs reach the number 1148 by comparing 1996 vote tallies from the School Board (30,935 registered voters) with the 1996 County Registry (dated 4/26/96) (29,787 registered voters). *Compare* Pl.Ex. 3 (School Board figures) with Pl.Ex. 10 (County figures). Defendants maintain, however, that the County's numbers

Despite this substantial number, the fact remains that buff cards don't vote. Even if 1148 out-dated buff cards remained in the notebooks for the 1996 election, plaintiffs offer scant proof that any voter used an out-dated buff card to vote.[21]

Presumably based upon a review of these buff cards, the plaintiffs compiled a list of 88 people who voted in 1996, whom they claim "did not *appear* to be properly registered." (emphasis added) Coleman Aff., Ex. F. At plaintiffs' request, the Westchester County Board of Elections compared the 88 names on the plaintiffs' list to the County Registry, in order to check if the voters were not registered. In doing so, the County found that only 19 of the 88 voters listed by plaintiffs were, in fact, not registered. Coleman Aff., Ex. F. At the hearing, the defendants further rebutted the charge of unregistered voting when they were able to prove that half of the remaining 19 voters did not appear on the County Registry because plaintiffs had misspelled their names on the list submitted to the County for comparison. *See* Def.Ex. J – Z; Tr. 275–92. At the end of the day, this left a handful of voters who may have been permitted to vote on out-dated buff cards.

Plaintiffs' remaining proof concerning the buff cards consists of photographs of nine buff cards that were improperly filled out or out-dated. Coleman Aff., Ex. G. Again, there is no evidence that any person voted after signing one of these cards. Moreover, nine improperly completed buff cards out of thousands proves nothing more than minor incon-

sistencies. Further, some of these nine buff cards are those of minority voters. For instance, Nellie Thornton—who passed away prior to the 1996 election but whose buff card remained on the books in 1996—was African–American. Tr. 268.

Another effect of the practice of using buff cards, plaintiffs argue, is that minority voters—who comprise a larger percentage of newly registered voters—are more likely to be told that their buff cards cannot be found.

Even if this were true, if no buff card exists for a voter—whether newly registered or not—that person may still vote by affidavit ballot at the poll site.[22] This ballot is later checked against the County Registry, in the presence of the candidates' poll watchers, in order to determine whether the voter is in fact registered. Luiso Aff. 6–8; Tr. 241, 303.[23]

3. *Assistance to Minorities Voting by Affidavit Ballot*

 As noted above, any person for whom a buff card cannot be located may vote by affidavit ballot.[24] The voter is required to sign an oath, swearing that he or she is duly registered. To properly complete an affidavit ballot, a voter must fill in his or her name, address, and school election district, and sign the ballot after taking the oath. *See* Def.Ex. F (sample affidavit ballot). The School Board trains its poll inspectors on how to instruct voters in filling out their affidavit ballots. Tr. 303–04. The affidavit ballots are then opened at the close of elections, after determination that the voter is regis-

---

are in constant flux, and may have changed by the date of the 1996 School Board election. Tr. 146–47, 210.

**21.** To the extent that plaintiffs challenge the accuracy of the buff cards for the upcoming 1997 election, they argue to no avail. *See* Tr. 383–89. Challenges to voter registration are decided by inspectors after the close of the election; when a challenge is made, the challenge form is attached to the buff card of the voter being challenged. Tr. 248–51. At this point, plaintiffs cannot prove that (1) the School Board will not remove any properly challenged buff card, (2) the School Board will not attach the challenge form to the buff card, or (3) any person with an out-dated buff card will actually vote. In fact, the School Board has already provided plaintiffs with over

100 challenge forms. Tr. 249–50. Plaintiffs presented no proof that there were any irregularities in the challenge system in prior elections.

**22.** For example, plaintiffs' witness Carol Alston testified that although election officials could not find her buff card, she then voted by affidavit ballot. Tr. 108–110.

**23.** While plaintiffs submitted the affidavit of *one* voter who was not allowed to vote by affidavit when his buff card was not found, Coleman Aff., Ex. H (Statement of Arthur Tyson), they offered no proof as to whether that voter was, in fact, registered and thus entitled to vote.

**24.** In 1996, the School Board counted 151 valid affidavit ballots. Pl.Ex. 3.

tered and in the presence of the candidates' poll watchers.

Plaintiffs allege that minority voters' affidavit ballots were invalidated more often than those completed by non-minority voters because minority voters were not assisted in completing their affidavits while non-minority voters were. In reaching this conclusion, Gloria Coleman reviewed the list of all those who voted by affidavit ballots and attempted to determine voter race based upon residence and last name. In some instances she had personal knowledge of the voters, although she could not estimate how many she personally knew. Tr. 391–94.

Assuming Ms. Coleman was accurate, in the 1996 election approximately 251 minorities voted by affidavit, while approximately 100 non-minorities did. Pl.Ex. 12, 13.

From these 251 affidavit ballots completed by minority voters, plaintiffs submit the statement of only one voter who can assert that she, herself, did not receive assistance in completing the ballot. Coleman Aff., Ex. H (Statement of Brenda Blanch). In contrast, one of plaintiffs' witnesses testified that she observed poll inspectors assisting a minority voter complete her affidavit ballot. Tr. 98, 106.[25]

4. *Absentee Ballots*

■ As previously noted, voters may vote by absentee ballot only if they (1) appear on the County's PSD List, or (2) fill out an application requesting an absentee ballot and qualify to receive one.[26] Upon receipt of such applications and prior to issuing an absentee ballot, the School Board verifies that the voter is registered and has signed the declaration at the bottom of the application.

tion. Def.Ex. D; Tr. 179–80. State law does not require the School Board to inquire further. *See* N.Y. Educ. Law § 2018–a(3) (McKinney 1995).

Plaintiffs' first contention is that the Board indiscriminantly distributes absentee ballots, allowing ICA members to pick up and deliver them to voters on the PSD list. Coleman Aff. ¶ 19. No proof was presented to support this allegation.[27] Moreover, an absentee ballot is not counted until the School Board verifies that the voter is on the PSD list or has submitted an application. Tr. 183–85. Additionally, a person's buff card indicates whether an absentee ballot was sent in by that voter. Tr. 183–84. As a result, a person cannot both vote by absentee ballot and in person. Nor will the Board validate two separate absentee ballots from one person.

Plaintiffs next claim that minority PSD voters did not regularly receive absentee ballots, while non-minority PSD voters did.

Plaintiffs support their claim through the statements of seven voters stating they did not "automatically" receive their absentee ballots in the mail. Coleman Aff., Ex. J. They have also submitted an affidavit from CEPAA-member Petra Baskett, who claims that 11 disabled minority voters told her they did not receive their absentee ballots in the mail as they should have. Affidavit of Petra Baskett ("Baskett Aff."), dated March 27, 1997, ¶ 3.

Despite the fact that plaintiffs point to the experiences of 18 PSD voters, there is no proof that these voters did not vote or did not eventually receive absentee ballots through the mail. In fact, the 11 voters

25. Plaintiffs also allege that approximately 150 minority voters' affidavit ballots were invalidated, while only 50 ballots completed by non-minority voters were invalidated. Pl.Ex. 13; Tr. 396–97. Yet they only allege that 25 of these 150 minority voters were, in fact, registered. Tr. 397. Even assuming the accuracy of these numbers, the School Board appropriately had no buff cards for the remaining 125 minority voters, and correctly invalidated their paper ballots. Plaintiffs offer no proof as to whether the 50 ballots from non-minority voters were improperly invalidated.

26. In 1996, the School Board counted 391 absentee ballots. Pl.Ex. 3.

27. The plaintiffs' proof did demonstrate that Ms. Coleman personally distributed absentee ballots to voters on the PSD list. Tr. 398, 400, 429, 431, 437. On this subject, Patricia DeNisco, a School Board employee, testified that absentee ballots are never handed out prior to receiving a completed application, but that she does not remember whether she ever handed an absentee ballot over to a third party who was delivering a completed application for a voter on the PSD list.

described in the Baskett Affidavit did timely vote by absentee ballot. Baskett Aff. ¶ 3.[28]

The Court credits the testimony of Dorothy Rampert, the School Board employee responsible for preparing and sending absentee ballots, that she mails ballots to every name on the PSD list that is provided by the County in January of each year.[29] Tr. 552–54; *see also* DeNisco Aff., 2.

Finally, plaintiffs claim that, in 1996, election officials failed to count 28 absentee ballots, most of which were cast by minority voters. Coleman Aff. ¶ 22. Plaintiffs offer no proof, however, that these 28 voters were, in fact, registered to vote and qualified to vote by absentee ballot.

### 5. *Assistance to and Treatment of Voters at Southside Polling Places*

 Plaintiffs first contend that the School Board failed to provide adequate assistance for voters at southside polling sites. Specifically, plaintiffs allege that the School Board provided receptionists to assist voters only at northside schools.

Plaintiffs have submitted statements and testimony from a handful of voters and one poll watcher stating that they did not observe a receptionist at three southside schools (Graham, Williams, and Longfellow schools). Coleman Aff., Ex. H, I; Tr. 381.

To rebut this, the School Board provided proof that it paid for a receptionist at each polling place.[30] Def.Ex. B (payroll register).[31] Tr. 214–19. The School Board also argues that the observations of voters who spent limited time at the polling places do not necessarily demonstrate the complete absence of receptionists, who were permitted breaks. *See* Def.Ex. C. In addition, plaintiffs' proof includes a voter's statement claiming there was no receptionist at Holmes school, which is located on the northside. Coleman Aff., Ex. H (Statement of Rene Kettrell). And again, no voter indicated that he or she did not vote because a receptionist failed to greet him or her.

 Plaintiffs also allege that minorities voting on the northside were harassed. Plaintiffs' evidence in support of this claim consists of statements from (1) two voters who were accused of perjury when they mistakenly stepped into the wrong line at a polling place, and (2) one voter who claimed that a poll inspector "didn't care" how she "spell[ed] her name." Coleman Aff., Ex. I. (Statements of Tracy Coleman and Edward Muhammed).

At most, this evidence reflects the unacceptable and regrettable behavior of particular individuals at a polling place. It does not rise to the level of a "practice or procedure" implemented by the School Board.

### B. *Additional Claims by Plaintiffs*

### 1. *Racist Campaign Appeals*

 Plaintiffs also contend that the 1996 election involved a racist campaign. To sup-

---

28. Plaintiffs have emphasized that several voters appear on both the PSD list and on the School Board's list of voters requesting an absentee ballot, presumably implying that PSD voters did not automatically receive their absentee ballots. *Compare* Pl.Ex. 14 (listing of voters requesting absentee ballots) and Def.Ex. AA (PSD list).

Defendants do not dispute the crossover. *See* Def.Ex. BB; Tr. 295. Indeed, Ms. Rampert testified that she does not cross-check the PSD list prior to sending out an absentee ballot when she receives a properly completed application. Tr. 559. Only one absentee ballot per person, however, is counted. Moreover, as defendants point out, a PSD voter might make a separate request for an absentee ballot for many reasons. For instance, a PSD might have misplaced an absentee ballot that was automatically received. Similarly, such a voter might forget he or she would receive a ballot automatically. *See, e.g.,* Tr. 428–29.

29. The School Board acknowledges two exceptions to this rule. Specifically, the School Board delivers absentee ballots to two Mount Vernon nursing homes. Tr. 177, 233–35.

30. The receptionists are typically members of the local community, often chosen from the Parent Teachers' Association. Tr. 216. Last year, one receptionist fell ill at the last minute and a school principal took over her duties. Tr. 169.

31. According to the School Board, the receptionists served to meet and greet voters; they were not equipped with maps or lists. Tr. 169. The receptionists were paid $45 to work from 7:00 a.m. until 9:00 p.m., Tr. 168, 215, and were permitted breaks during "off peak" hours. Def. Ex. C.

port this allegation, plaintiffs submitted two campaign letters that were signed by sitting School Board Trustees; the letter warned voters to protect their property values by supporting white ICA-endorsed candidates to the School Board. Pl.Ex. 1.

Likewise, two voters submitted affidavits declaring that they had received phone calls from ICA members requesting support for ICA-backed candidates; the callers warned that if minority candidates were elected, they would undermine the quality of public education in Mount Vernon and would cause a decline in property values. Affidavit of Linda Castro, dated March 27, 1997; Affidavit of George Berger, dated April 18, 1997.

While such campaign tactics are disturbing, they are not electoral "practices or procedures." They were not implemented by any official actor with responsibility for conducting the elections. The Board Trustees do not conduct or supervise elections. Nor did plaintiffs offer any proof implicating DeBenedictus or his election staff in these campaigns, other than mere speculation based on DeBenedictus' ICA membership. *See* Tr. 136–38. *See Welch v. McKenzie*, 765 F.2d 1311, 1316 (5th Cir.1985) (no § 2 violation because fraudulent acts were committed by candidate and his supporters who were not officials responsible for the election).

### 2. *Waiting Time and Level of Confusion at Southside Polling Places*

Plaintiffs generally claim that the School Board's practices result in longer lines and greater confusion at southside polling sites, resulting in the loss of minority votes.

**As an initial matter, the Court notes that long lines, delays and confusion—in and of themselves—do not constitute any "practice or procedure" of the School Board. Indeed, they may reflect nothing more than the ineffectiveness or inefficiency of individual election workers.

Moreover, plaintiffs have not established the existence of longer lines, greater confusion, or less adequate assistance at southside polling locations than at northside polling sites.[32] While fewer than eight voters and poll inspectors submitted statements or testimony attesting to lines and delays at southside schools,[33] the testimony of two of plaintiffs' witnesses indicates that they waited, at most, 10 to 20 minutes at southside polling places. Tr. 99, 103, 113. Another statement submitted by plaintiffs indicates there were long lines at Lincoln school, on the northside. Coleman Aff., Ex. H (Statement of Vanessa Fan).

As for their confusion claim, plaintiffs point only to a single voter's experience as a voter who did not vote on account of confusion.[34] Moreover, plaintiffs submitted two voter statements to the effect that confusion existed at Lincoln and Columbus schools, on the northside. Coleman Aff., Ex. H (Statements of Vanessa Fan and Carla James).

### 3. *Voter Challenges*

At the hearing, plaintiffs raised the point that—this year—they were not provided the opportunity to view and to challenge the buff cards two weeks before the May 6, 1997 election. *See* N.Y. Educ. Law § 2606(2).[35]

The School Board has made the buff cards available to plaintiffs, albeit a few days late.

---

**32.** As stated *infra*, the School Board provides maps and street guides at each polling place, and staffs each with at least four poll inspectors. Tr. 159, 237, 244. Further, between 1995 and 1996, the School Board increased the number of poll inspectors available at both northside and southside schools. Tr. 162–164.

**33.** Plaintiffs also submitted conclusory testimony from Gloria Coleman, Reverend Richardson, Vanda Seward, and Gary Simmons, based on their observations of other voters. None of these witnesses, however, could identify a particular voter who did not in fact vote because of long lines or delay. *See, e.g.*, Tr. 27–28, 30, 80–81.

**34.** Plaintiffs did submit conclusory testimony based on observations of other voters' confusion. None of this testimony established that any such voters actually failed to vote.

**35.** Typically, challenges to a voter's registration status are made on election day. Official challenge forms are provided at polling places. Any completed challenge form is attached to a voter's buff card; the challenged voter, however, may still vote by affidavit. At the conclusion of the election, poll inspectors determine the validity of the challenge and whether to validate the ballot. Tr. 152, 248–51.

Further, it has provided plaintiffs with over 100 challenge forms. Tr. 249–50.[36]

### 4. Keeping Persons Without Official Election Functions from within 100 Feet of the Polling Places

Plaintiffs claim that the School Board has improperly permitted school administrators and teachers, who allegedly intimidate voters, to be within 100 feet of polling places. New York law prohibits electioneering within 100 feet of polling places. See N.Y. Educ. Law § 2609(4–a)(b) (McKinney 1995).

Plaintiffs, however, offer no evidence that any voter was intimidated by school personnel near the polls, or that anyone without official election functions electioneered within 100 feet of the polls.

Moreover, even if plaintiffs' conclusory allegation were true, plaintiffs have not shown that this is a "procedure or practice" of the School Board.[37]

### C. Totality of the Circumstances Analysis

Before determining the strength of plaintiffs, voting rights claims, the Court recognizes that it must consider the "totality of the circumstances." In this regard, the Court has considered the evidence offered by plaintiffs that describes general racial tension in Mount Vernon and disparities in the quality of education between northside and southside schools, and the statistics compiled by plaintiffs' counsel regarding racial bloc voting. See Pl.Ex. 4, 5; Tr. 62, 92; Verif. Compl. ¶¶ 17–19 & Ex. B; Coleman Aff. ¶ 6 & Ex. A, B.

The Court also notes that African–Americans in Mount Vernon have been elected to numerous positions of political significance. See Coleman Aff. ¶ 3. Although such success at the polls is not fatal to plaintiffs' claims, Gingles, 478 U.S. at 75, the Court considers it meaningful in assessing the totality of the

circumstances, see Niagara Falls, 65 F.3d at 1009 (noting electoral success of black candidates).

Considering these circumstances, and in light of the deficiencies in the plaintiffs' proof as discussed throughout this Opinion, the Court concludes that plaintiffs have failed to raise sufficiently serious questions going to the merits of their voting rights claims in order to warrant the issuance of preliminary injunctive relief.

### III. Department of Justice Monitoring

█ Pursuant to 42 U.S.C. § 1973a, a district court may authorize the appointment of federal examiners to monitor the School Board elections upon a determination that it would be "appropriate" and "necessary" to enforce voting guarantees. 42 U.S.C. § 1973a(a). As previously stated, the Court has found that at this preliminary stage in the proceedings the plaintiffs have been unable to meet their burden in establishing even sufficiently serious questions going to the merits of their claim that voting rights have been violated. Based on the evidence presented by plaintiffs, the Court cannot find that Department of Justice monitoring is either appropriate or necessary.

### CONCLUSION

For the reasons stated above, plaintiffs' request for injunctive relief is denied. Plaintiffs' request for an order authorizing the appointment of federal monitors is also denied.

So ordered.

█

---

36. The School Board explains its lateness by noting that it does not receive an updated County Registry until April and that this litigation has diverted its time and resources from preparing the buff cards for inspection.

37. The schools that serve as polling places remain open while school board elections take place. The Court notes that it would be logistically difficult to prohibit or regulate the presence of teachers and administrators working on the same premises.