Russell Allen NORDYKE;  Sallie
Nordyke, dba TS Trade Shows,
Plaintiffs–Appellees,

v.

SANTA CLARA COUNTY;  Santa Clara
County Fairgrounds Management Cor-
poration, Inc., a California nonprofit
corporation;  Michael Honda;  Bianca
Alvarado;  Ron Gonzales;  James T.
Beall, Jr.;  Dianne Mckenna;  Carl Cook-
son;  Barbara Perzigian;  Robert Quin-
lan;  Jaime Rosso;  Jack Rouleau;  Steve
Tedesco;  John Vidovich, in their official
capacities, Defendants–Appellants.

No. 96–16377.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 13, 1997.

Submission Deferred Feb. 13, 1997.

Resubmitted March 14, 1997.

Decided April 4, 1997.

Paul A. Bruno, Thelen, Marrin, Johnson & Bridges, San Jose, CA, for defendants-appellants.

Joseph D. Wargo and Russell S. Bogue, Holland & Knight, Atlanta, GA, and Edward P. Davis, Jr., Genesis Law Group, LLP, San Jose, CA, for plaintiffs-appellees.

John A. Crose, Jr., O'Melveny & Myers, Los Angeles, CA, Robert Fabela, Deputy City Attorney, San Jose, CA, for amici curiae.

Before SNEED, LEAVY, and THOMAS, Circuit Judges.

SNEED, Circuit Judge:

This is an appeal from a preliminary injunction preventing the enforcement of an addendum to the lease between the Santa Clara County Fairgrounds Management Corporation (SCCFMC) and the owner of the Fairgrounds, Santa Clara County. The addendum, approved by the County Board of Supervisors on January 23, 1996, reads as follows: "[e]xcept for uses that are required under Existing Contracts, Tenant [SCCFMC] shall not permit any gun shows on the Premises." In April, 1996, the County Counsel sent a letter to the SCCFMC to "clarify the intention of the Board of Supervisors with respect to" the addendum. That letter states:

> It is the intention of the Board only to prohibit any person from selling, offering

for sale, supplying, delivering, or giving possession or control of firearms or ammunition to any other person at a gun show at the fairgrounds. This prohibition applies to any act initiating any of the foregoing transactions with the intent of completing them at a later date.

It is not the intention of the Board to prohibit the exchange of information or ideas about guns, gun safety, or the display of guns for historical or educational purposes.

We interpret the addendum in accordance with the County's clarification thereof and hereafter shall refer to both as the "addendum." [1] This prohibition was both vigorously defended and attacked within Santa Clara County. The purposes of the ban were stated by the Board of Supervisors to be to "avoid sending the wrong message to the community relative to support of gun usage," "to improve the Fairgrounds' image," and to reduce "the fiscal impact of criminal justice activities in response to gun-related violence."

On May 14, 1996, the Nordyke appellees, who previously had conducted gun shows at the Santa Clara Fairgrounds, filed this suit in the District Court of the Northern District of California, in which they sought a preliminary injunction to prevent the enforcement of the addendum on the ground that it infringed the protection afforded by the First Amendment to their commercial speech that accompanied their gun shows. On July 8, 1996, the district court found that the addendum violated the appellees' constitutional rights under the First Amendment and enjoined its enforcement. Santa Clara County timely filed an appeal. We affirm.

## I.

### PREEMPTION

Prior to oral argument, we requested that both parties brief the issue whether federal or state law preempted Santa Clara County's addendum to its lease with the Fairgrounds Management Corporation. While these briefs have been helpful, we conclude we should not address this issue. The district court did not rest its decision on preemption and, were we inclined to do so, a remand to the district court for full briefing and argument would perhaps be appropriate. A further difficulty is that preemption normally contemplates the subordination of a statute, ordinance, or rule of law, not a term of a lease. While a lease term beyond the powers of Santa Clara County would be unenforceable, to decide this case on such grounds would require that we interpret state and federal law of some detail and complexity. [2]

1. At oral argument, and in a later supplemental brief, the County has attempted to distance itself from the interpretation set forth in the April 1996 letter. The County now contends that it intends to prohibit only gun sales at the Fairgrounds, and that its ban does not prohibit solicitation of gun sales. Regardless, we interpret the addendum in accordance with the documentation presented to the district court. Of course, the County is free at any time to modify the addendum as it sees fit.

2. Initially it would be necessary to determine whether preemption is a proper doctrine to employ when the provision sought to be preempted by superior law is merely a term in a lease rather than a duly enacted ordinance of the county.

In addition, a preemption analysis would compel an analysis of a complex body of state and federal law governing gun shows. For example, the California Penal Code contains several provisions pertaining to gun shows. Section 12070(a) establishes the basic rule that only one licensed pursuant to section 12071 may sell, lease, or transfer firearms. Subsection (b) of section 12070 provides a narrow exception for "[t]he sale, lease, or transfer of used firearms other than pistols, revolvers, or other firearms capable of being concealed upon the person, at gun shows or events," provided the conditions of section 12070(b)(5) are met. When so met, such a person "shall be known as a 'Gun Show Trader.'" Section 12071(b)(1)(B) states expressly that gun dealers who conduct business at gun shows must comply with "all applicable local laws, regulations, and fees, if any."

Section 12070(b)(4) also excludes from the license requirement the "infrequent sale, lease, or transfer of firearms," which is elaborately defined and limited by section 12070(c).

Section 12071 of the Penal Code governs the licensing of those who sell guns. It is a very elaborate section, which includes section 12071(b)(1)(B), specifying that a person properly licensed under section 12071(a) "may take possession of firearms and commence preparations of registers for the sale, delivery, or transfer of firearms at gun shows or events, as defined in Section 178.100 of Title 27 of the Code of Federal Regulations, or its successor, if the gun show or event is not conducted from any motorized or towed vehicle...."

Such a task had best be left to others, providing its avoidance is fairly available, a condition which, we believe, exists in this case. That is, we are convinced that the district court was correct in striking from the lease its addendum on First Amendment grounds.

■ Before passing to our analysis of the fairly recent First Amendment jurisprudence pertaining to "commercial speech," we observe that the district court correctly stated the burden that a party moving to obtain a preliminary injunction must discharge. Judge Ware put it this way: "In the Ninth Circuit, in order to obtain a preliminary injunction, the moving party must show a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardship tips sharply in its favor." *Nordyke v. County of Santa Clara*, 933 F.Supp. 903, 905 (N.D.Cal.1996) (citing *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 612 (9th Cir.1989)).

## II.

### *IS THE FIRST AMENDMENT APPLICABLE?*

■ The Fourteenth Amendment, by incorporating the First Amendment and applying it to the States, precludes state and local governments from "abridging the freedom of speech." Appellants contend that the addendum at issue in this case is not properly subject to First Amendment analysis, because it does not abridge anyone's freedom of speech. Rather, they claim, the addendum merely prohibits the sale of guns, and the sale of guns is not "speech" within the meaning of the First Amendment.

■ We agree that the act of exchanging money for a gun is not "speech" within the meaning of the First Amendment. However, the addendum covers more than the simple exchange of money for a gun. The addendum purports to prohibit any person from "offering for sale . . . firearms or ammunition to any other person at a gun show at the fairgrounds." The Supreme Court has defined commercial speech as speech that "does no more than propose a commercial transaction." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 762, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976); *Board of Trustees of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482, 109 S.Ct. 3028, 3036, 106 L.Ed.2d 388 (1989). An offer to sell firearms or ammunition is speech that "does no more than propose a commercial transaction." Such an offer is, therefore, commercial speech within the meaning of the First Amendment.

■ Of course, the First Amendment does not protect all proposals to engage in commercial transactions. An offer to pay a "hit man" one million dollars to murder my neighbor proposes a commercial transaction. Similarly, an offer to pay a government official to provide unauthorized copies of classified documents also proposes a commercial transaction. But these proposals to engage in commercial transactions are not accorded First Amendment protection because the underlying transaction is illegal. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980) ("For commercial speech to come within [the First Amendment], it at least must concern lawful activity").

■ Thus, a threshold question in the present case is whether the commercial speech at issue-i.e., an offer to sell firearms at a gun show at the Fairgrounds-concerns lawful activity. We conclude that the sale of firearms at a gun show at the Fairgrounds, which is not proscribed by federal or state law, is "lawful activity," because the County has not enacted an ordinance to prohibit such sales.[3] The distinction between an ordinance

---

C.F.R. 178.100(b) defines a gun show as follows:

A gun show or an event is a function sponsored by any national, State, or local organization, devoted to the collection, competitive use, or other sporting use of firearms, or an organization or association that sponsors functions devoted to the collection, competitive use, or other sporting use of firearms in the community.

**3.** To reiterate, we are assuming, without deciding, for the purposes of this analysis, that the County has the power to enact such an ordinance. However, we acknowledge that, under

and a contract provision is critical. SCCFMC has agreed in its contract with the County not to permit, *inter alia*, the sale of guns at gun shows at the Fairgrounds.[4] Hence, if SCCFMC rents all or a portion of the Fairgrounds to a lessee for the purpose of conducting a gun show, the lessee proceeds to sell guns at that gun show, and SCCFMC does nothing to prevent that sale, then SCCFMC has arguably breached its contract with the County. But neither the lessee nor SCCFMC has done anything illegal. Since the sale of guns at a gun show at the Fairgrounds is "lawful activity," *Central Hudson*, 447 U.S. at 566, 100 S.Ct. at 2351, a proposal to engage in such a transaction is protected as commercial speech under the First Amendment.

### III.

### *FIRST AMENDMENT PROTECTION OF COMMERCIAL SPEECH*

■ The conclusion that speech is "commercial," and that it concerns lawful activity, does not mean that it enjoys unqualified First Amendment protection. Indeed, only in 1976 did it become clear that "commercial speech," not otherwise serving some perceived public interest, was to a limited extent protected by the First Amendment. *See Virginia State Bd. of Pharmacy*, 425 U.S. 748, 96 S.Ct. 1817. There the Court held that a state statute that branded as unprofessional conduct advertising by a pharmacist of his prices for drugs dispensed only by prescription violated the First Amendment. In so holding, the Court observed:

> Our pharmacist does not wish to editorialize on any subject, cultural, philosophical, or political. He does not wish to report any particular newsworthy fact, or to make generalized observations even about commercial matters. The "idea" he wishes to communicate is simply this: "I will sell you the X prescription drug at the Y price." Our question, then, is whether this commu-

nication is wholly outside the protection of the First Amendment.

*Id.* at 761, 96 S.Ct. at 1825. In response to its question, the Court held it was within the First Amendment's protection.

Four years later, the Supreme Court articulated the following four part test that commercial speech regulations must satisfy to survive First Amendment scrutiny.

> For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Central Hudson*, 447 U.S. at 566, 100 S.Ct. at 2351.

Generally speaking, the Supreme Court has had trouble applying this test. For example, the meaning of the "no more extensive than necessary" requirement has been modified to require only a "reasonable fit" between the legislative ends and means chosen to accomplish those ends. *Fox*, 492 U.S. at 480, 109 S.Ct. at 3034–35. The "fit" requirement was made more demanding on government by the Court in striking down an ordinance restricting access to newsracks intended to be used only to distribute newspapers. The publisher of a free magazine that advertised certain free educational, recreational, and social programs was given access to these newsracks. *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993).

In *Edenfield v. Fane*, 507 U.S. 761, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993), the Court held that a Florida Board of Accountancy rule forbidding "direct, in person, uninvited solicitation" of business by a Florida licensed C.P.A. did not "directly advance" the governmental interest asserted. Accordingly, the

---

established preemption principles, the County may in fact lack that power.

4. The record does not state explicitly that SCCFMC agreed either to the contract adden-

dum, or to the later interpretation of that addendum. Even so, we assume SCCFMC's agreement for purposes of this analysis.

rule was held to be in violation of the First Amendment.

The following year the Supreme Court also struck down an effort by the same Board to prevent one who was both a C.P.A. and a lawyer, as well as a C.F.P. (Certified Financial Planner), from advertising that she was so qualified. *See Ibanez v. Florida Dept. of Bus. and Prof'l Regulation, Bd. of Accountancy,* 512 U.S. 136, 114 S.Ct. 2084, 129 L.Ed.2d 118 (1994). The Court stressed that the speech in question concerned lawful activities and was not misleading.

The Court has also held that the statute's failure to advance directly the asserted governmental interest invalidated section 5(e)(2) of the Federal Alcohol Administration Act, prohibiting beer labels from displaying their alcohol content. *See Rubin v. Coors Brewing Co.,* 514 U.S. 476, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995).

Nonetheless, the Supreme Court in recent years has upheld some commercial speech regulations. In *United States v. Edge Broadcasting Co.,* 509 U.S. 418, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993), it upheld a federal statute, 18 U.S.C. § 1307, which restricted lottery advertising by broadcasters to those stations located within the state operating the lottery. The Court focused on the governmental interest asserted and whether its implementation was more extensive than necessary. It found the former was "substantial" and the "fit" between the statute's restrictions and the governmental interest was a reasonable one.

Another recent instance in which the Court upheld a restraint on commercial speech is *Florida Bar v. Went For It, Inc.,* —— U.S. ——, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995). The restraint was a Florida Bar rule that prohibited lawyers from using direct mail to solicit personal injury or wrongful death clients within thirty days of an accident. The Bar's interest was found to be substantial, easily distinguished from price advertising by attorneys for "routine" legal services, and the prohibition was no more extensive than necessary.

To repeat, the *Central Hudson* test is not easy to apply and the cases summarized above might suggest it is sufficiently flexible to accommodate "good" commercial speech and to suppress that which is "not so good." In any event, Justice Stevens, who authored the majority opinion in a recent case, *44 Liquormart, Inc. v. Rhode Island,* —— U.S. ——, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996), indicated that in his view all truthful and not misleading commercial speech was protected by the First Amendment. *44 Liquormart, Inc.* involved two Rhode Island statutes attempting to restrain liquor price advertising. The first barred both in-state and out-of-state vendors from price advertising in Rhode Island, while the second prohibited Rhode Island news media from disseminating liquor prices from whatever sources.

Justice Stevens dutifully applied the *Central Hudson* test and found that the Rhode Island ban satisfied neither its third ("directly advances") prong nor its fourth ("not more extensive") prong. In concurring, Justice O'Connor, speaking for the Chief Justice and Justices Souter and Breyer, stoutly continued to support the *Central Hudson* test in all its four parts. The ban affected lawful and not misleading speech; however, the "fit" between the restriction and the state's goal of reducing the consumption of alcohol was not reasonable. Increasing the tax on liquor sales would achieve that end without impinging on First Amendment rights.

## IV.

## CENTRAL HUDSON AS APPLIED TO SANTA CLARA'S ADDENDUM

Despite the diminishing enthusiasm on the part of the Supreme Court concerning the legitimacy of the third and fourth parts of the *Central Hudson* test, their repudiation has not occurred. Therefore, we must utilize all its parts in determining the constitutionality of Santa Clara's addendum to its fairgrounds' lease.

The "lawful" portion of the *Central Hudson* test presents no difficulty in this case. The proscribed activity, to repeat, is not contrary to federal or state law, nor has Santa Clara enacted an ordinance prohibiting it. Moreover, the County has never alleged that the speech at issue is misleading.

■ The third and fourth parts of the *Central Hudson* test readily yield results when applied to this case. Whether the addendum "directly advances the governmental interest asserted" must be answered negatively. It is, to repeat, neither an ordinance nor a ban on gun shows. At most, it merely reflects certain concerns about the proliferation of guns and their use in the commission of crimes, while permitting the continuation of gun shows at the Fairgrounds. As Judge Ware noted, "[b]y banning gun sales only at the Fairgrounds, the Board achieves nothing in the way of curtailing the overall possession of guns in the County." 933 F.Supp. at 909.

■ Also, the addendum is "more extensive" than necessary, or to use the proper "fit" formulation of the standard, it is an attempt to accomplish what it could have achieved by means of either a properly drafted ordinance or a simple prohibition of gun shows at the Fairgrounds.

■ It is true, of course, that government at all levels has a substantial interest in protecting the people from those who acquire guns illegally and use them to commit crimes resulting in injury or death of their victims. Substantial, effective, and carefully drafted legislative acts to improve public safety generally, which may curb specific commercial speech, could easily satisfy the third and fourth parts of the *Central Hudson* test. The lease addendum before us does not meet these criteria. It curtails commercial speech, rather than attempting to impose by proper legislative acts such restrictions on the sale of guns at gun shows not otherwise provided by, but consistent with, the applicable federal and state law.

■ We acknowledge that a distinct goal underlying the County's gun show policy is to avoid sending the message to the community that the County promotes gun usage. It is debatable whether that qualifies as a substantial interest. However, assuming, *arguendo*, that it is a substantial interest, the County has nevertheless failed to "demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Florida Bar*, —— U.S. at ——, 115 S.Ct. at 2377 (quoting *Rubin*,

514 U.S. at ——, 115 S.Ct. at 1592 (quoting *Edenfield*, 507 U.S. at 771, 113 S.Ct. at 1800)). The County has not presented a shred of evidence that any County resident, or anyone else, has somehow gotten the mistaken impression that the County promotes gun usage. Even assuming that some people mistakenly believe that to be true, the County has offered no evidence to substantiate its claim that the practice of holding gun shows at the Fairgrounds either caused or reinforces that mistaken belief. Rather, the record suggests that the addendum is at best an inept response to pressure by residents who strongly support the cause of gun control.

■ Finally, even assuming that the County could demonstrate that the practice of hosting gun shows at the Fairgrounds fosters an unwanted misperception within the community, the County would still have to prove that its policy of allowing the gun shows, while restricting commercial speech at those gun shows, would "alleviate [that misperception] to a material degree." *Id.* In short, to justify its commercial speech restriction, the County possibly would have to provide a detailed study to substantiate the intuitions of Board members that led to adoption of the policy, just as the Florida Bar produced a detailed study to justify its restrictions on lawyer advertising and solicitation. *See Florida Bar*, —— U.S. at ——, ——, 115 S.Ct. at 2374, 2377.

Therefore, we agree that the addendum to the lease between Santa Clara County and its lessee, SCCFMC, is contrary to the First Amendment.

AFFIRMED.