SOUTHWEST VOTER REGISTRA-
TION EDUCATION PROJECT;
Southern Christian Leadership Con-
ference of Greater Los Angeles; and
National Association for the Advance-
ment of Colored People, California
State Conference Branches, Plaintiffs,

v.

Kevin SHELLEY, in his official
capacity as California Secretary
of State, Defendant.

No. CV 03–5715 SVM (RZX).

United States District Court,
C.D. California.

Aug. 20, 2003.

Alan L. Schlosser, Margaret C. Crosby, ACLU Foundation of Northern California, San Francisco, CA, Peter J. Eliasberg, ACLU Foundation of Southern California, Los Angeles, CA, Jordan Charles Budd ACLU Foundation of San Diego and Imperial Counties, San Diego, CA, Mark D. Rosenbaum, American Civil Liberties Union of Southern California, Los Angeles, CA, Daniel P. Tokaji, Ohio State University Mortiz College of Law, Columbus, OH, Erwin Chemerinsky, USC Law School, Los Angeles, CA, for plaintiff.

Susan R. Oie, Douglas J. Woods, CAAG—Office of Attorney General of California, Sacramento, CA, for defendant.

ORDER DENYING PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

WILSON, District Judge.

## I. INTRODUCTION

Plaintiffs Southwest Voter Registration Education Project, Southern Christian Leadership Conference of Greater Los Angeles, and National Association for the Advancement of Colored People, California State Conference Branches ("Plaintiffs") bring this lawsuit alleging that the proposed use of "punch-card" balloting machines in the forthcoming California election will violate the U.S. Constitution and Voting Rights Act. Plaintiffs move this Court for an Order delaying that election, currently scheduled for October 7, 2003, until such time as it can be conducted without use of punch-card machines.

The Court has consolidated Plaintiffs' Ex Parte Application for Temporary Restraining Order with Plaintiffs' Motion for Preliminary Injunction. The Motion has been fully briefed by both sides, and the Court has heard oral argument from all parties, including Intervenor Ted Costa.

Having carefully considered the arguments and record before the Court, and for the reasons stated herein, the Court HEREBY DENIES Plaintiffs' Motion for Preliminary Injunction.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. The October 7, 2003 Election

On July 23, 2003, California Secretary of State Kevin Shelley announced that more than 1.3 million signatures of registered California voters had been received and verified in connection with a recall petition for incumbent Governor Gray Davis. As that number exceeded the amount of signatures required to initiate a recall election, Shelley certified on that date the first recall election of a Governor in California history.

Under the California Constitution, the Lieutenant Governor is charged with set-

ting the date of a gubernatorial recall. *See* Cal. Const. Art II, sec. 17. The Constitution requires that the election be held not less than 60 days and not more than 80 days from the date of certification. Cal. Const. Art 2, Sec. 15(a). The only exception to this time frame applies where a regular election is already scheduled to be held within 180 days of the date of certification. *See* Cal. Const. Art 2, Sec. 15(b). In that circumstance, the recall election may be consolidated with the regularly scheduled election. *Id.*

Because the next regularly scheduled election is to be held in March of 2004—more than seven months from the date of certification—the 60 to 80 day time frame applies. Accordingly, Lt. Governor Cruz Bustamante signed a proclamation on July 24, 2003 ordering that the recall election take place on October 7, 2003 (the last Tuesday within the allotted period).

At that time, California voters are scheduled to decide whether or not Governor Gray Davis should be recalled and, if so, who should replace him. Also on the ballot will be two statewide initiatives: Proposition 53, a proposed constitutional amendment sponsored by the state legislature that would require a portion of the state's budget be set aside for infrastructure spending; and, Proposition 54, a measure that would ban government agencies from collecting certain racial information.

### B. *This Lawsuit*

Plaintiffs bring this lawsuit to delay the October 7, 2003 election until it can be conducted without use of pre-scored punch-card balloting machines. Plaintiffs allege that punch-card machines result in an average combined "residual vote rate" of 2.23%. Residual votes consist of "overvotes" (ballots disqualified because they are read by the machine as containing more than one vote on a single contest or ballot issue) and "undervotes" (ballots read by the machine as not containing a vote). While residual votes may be caused by factors other than machine error—including, for instance, a voter's affirmative choice not to vote—Plaintiffs allege that the residual vote rate of punch-card machines is, on average, twice that experienced by other voting technologies.

Plaintiffs claim, therefore, that voters using punch-card machines to cast their votes in the October 7 election will have a comparatively lesser chance of having their votes counted, in violation of the Equal Protection Clause of the U.S. Constitution's Fourteenth Amendment. (*See* First Amended Complaint ("FAC") ¶ 42.) Further, Plaintiffs allege that the counties employing punch-card systems have greater minority populations than counties using other voting systems, thereby disproportionately disenfranchising and/or diluting the votes of voters on the basis of race, in violation of Section 2 of the Voting Rights Act (codified at 42 U.S.C. §§ 1973). (FAC ¶ 46.)

### C. *Common Cause Litigation*

On April 17, 2001, a number of individuals and entities—including two of the three Plaintiffs in the instant case—brought suit in this Court alleging similar constitutional and statutory violations. *See Common Cause, et al. v. Bill Jones,* CV 01–03470–SVW ("*Common Cause*"). The plaintiffs in the *Common Cause* litigation levied their allegations not against the use of punch-card balloting in a particular election, but based upon the Secretary of State's certification of punch-card machines for use in all California elections. They also challenged the adequacy of the State's recount procedures.

During the pendency of the *Common Cause* litigation, then California Secretary of State Bill Jones decertified punch-card voting systems for use in Cal-

ifornia elections on or after January 1, 2006. Secretary Jones later advanced the decertification date to July 1, 2005. Without conceding the allegations of the Complaint, the Secretary of State entered into a stipulation whereby he agreed to decertify the machines, and to submit to the Court the question whether it was "feasible" for the State to do so by either March or November 2004.

The Court concluded that it was feasible for the nine counties using punch-card machines to replace those machines with other certified voting systems in advance of the elections in March of 2004. *See Common Cause v. Jones,* 2002 WL 1766436 (C.D.Cal. Feb.19, 2002). A Consent Decree reflecting the March 2004 date was signed by the parties, and a Final Judgment thereupon was entered by the Court on May 8, 2002.

## III. PRELIMINARY INJUNCTION STANDARD

■ A party moving for preliminary injunctive relief bears the burden of proving either "(1) a combination of probable success on the merits and the possibility of irreparable harm; or (2) that serious questions are raised and the balance of hardships tips in its favor." *Sammartano v. First Judicial District Court,* 303 F.3d 959, 965 (9th Cir.2002) (citations and internal quotations marks omitted); *see also Johnson v. California State Bd. of Accountancy,* 72 F.3d 1427, 1430 (9th Cir. 1995); *Metro Pub. Ltd. v. San Jose Mercury News,* 987 F.2d 637, 639 (9th Cir. 1993); *Nordyke v. Santa Clara County,* 110 F.3d 707, 710 (9th Cir.1997). "These two alternatives represent extremes of a single continuum, rather than two separate tests." *Sun Microsystems, Inc. v. Microsoft Corp.,* 188 F.3d 1115, 1119 (9th Cir. 1999).

When the public interest is affected by the proposed injunction it is also factored into the analysis. *See Sammartano,* 303 F.3d at 965; *Fund for Animals v. Lujan,* 962 F.2d 1391, 1400 (9th Cir.1992); *Caribbean Marine Servs. Co. v. Baldrige,* 844 F.2d 668, 674 (9th Cir.1988). While the effect on the public interest was, at one time, part of the "balance of hardships" analysis, the Ninth Circuit has held that this factor "is better seen as an element that deserves separate attention in cases where the public interest may be affected." *Sammartano,* 303 F.3d at 974 (citing *Fund for Animals,* 962 F.2d at 1400).

## IV. ANALYSIS

### A. Probability of Success on the Merits

To determine the likelihood that Plaintiffs will prevail on the merits of their lawsuit, it is first necessary to consider the viability of any defenses to its prosecution.[1] Only then does the Court consider the substance of Plaintiffs' claims.

### 1. *Res Judicata*

■ A subsequent action may be barred under the doctrine of res judicata where (1) it involves the same "claim" as an earlier suit, (2) the earlier suit has reached a final judgment on the merits, and (3) the earlier suit involves the same parties or their privies. *Nordhorn v. Ladish Co.,* 9 F.3d 1402, 1404 (9th Cir.1993). It is well-settled that a consent decree constitutes a final judgment on the merits "and thus bars either party from reopening the dispute by filing a fresh lawsuit." *United States v. Fisher,* 864 F.2d 434, 439 (7th Cir.1988) (collecting authorities). Thus, the Court turns to the first and third prongs of the res judicata analysis.

---

1. Unlike the other elements of a motion for preliminary injunction, the burden will ultimately be on Defendant to prove any defenses.

(1) *Identity of Claims*

■ Whether or not two "claims" are the same for purposes of res judicata depends upon:

1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action;

2) whether substantially the same evidence is presented in the two actions;

3) whether the two suits involve infringement of the same right; and

4) whether the two suits arise out of the same transactional nucleus of facts.

*Nordhorn*, 9 F.3d at 1405.

■ All of these conditions are satisfied. First, the facts and constitutional deprivations alleged by Plaintiffs are nearly identical to, and at some points verbatim recitations of, those asserted in the *Common Cause* case. (*Compare, e.g.*, Compl. ¶¶ 3, 5, *Common Cause v. Jones, with* FAC ¶¶ 3, 5.) Indeed, this suit explicitly challenges "the same punch card voting machines challenged before this Court in *Common Cause, et al. v. Jones* ... which resulted in a consent decree decertifying these machines effective March 1, 2004 ...." (FAC ¶ 1.)

As that statement reflects, the rights established by *Common Cause* would certainly be impaired by permitting this suit to proceed. The California Secretary of State was party to the Consent Decree in *Common Cause*, which set a deadline of March 2004 for the decertification of prescored punch-card machines. That Decree formed the basis of a Final Judgment entered by this Court on May 8, 2002. Implicit in the Consent Decree and Judgment is an intervening period during which punch-card machines would remain certified for use. The State's right to use such machines until March 2004, and the State's interest in an orderly replacement of punch-card balloting, would both be evis-

cerated if this suit proceeded to a contrary end.

Plaintiffs argue, however, that a 2003 recall election was unknowable at the time of the 2001 Consent Decree, and that their litigation strategy would have been altered had they known the election was likely. But the recall provision of the California Constitution is hardly an arcane constitutional anachronism. In its ninety-two year history, parties have attempted to invoke it on numerous prior occasions, and it was the subject of amendment as recently as 1994. Thus, though plaintiffs might not have known that a recall election was *probable*, they certainly knew one was *possible*. They nonetheless chose to seek decertification by March 2004. Now they demand another remedy for the same violation—in essence, to advance the date of the required decertification from March 2004 to October 2003.

Plaintiffs analogize to a situation in which a school district, ordered to desegregate its schools, subsequently opens a new, all-white school. Such an action would be a direct affront to the spirit of a court order, however, and a subsequent remedy would clearly be within a federal court's continuing jurisdiction to "vindicate its authority" and "effectuate its decrees." *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 380, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). The comparable analogy in this case would be an attempt by the Secretary of State to advance the March 2004 primary to February 2004, thereby circumventing the spirit of the Consent Decree. But no such event has transpired. The State has not moved a scheduled election, nor enacted a recall provision of which the *Common Cause* plaintiffs were unaware. Rather, the people of the State have invoked a state constitutional provision of which the plaintiffs were, or should have been, well apprised.

Accordingly, Plaintiffs are seeking to establish the same constitutional violations alleged in *Common Cause*, but to secure an additional remedy.[2]

b. *Identity of Parties*

This case was originally filed by two organizations that were also plaintiffs in *Common Cause v. Jones:* the Southwest Voter Registration Education Project, and the Southern Christian Leadership Conference ("SCLC"). The First Amended Complaint added a third plaintiff, the California NAACP, which was not a party to the *Common Cause* litigation.

The Ninth Circuit has held, however, that "when two parties are so closely aligned in interest that one is the virtual representative of the other, a claim by or against one will serve to bar the same claim by or against the other." *Nordhorn*, 9 F.3d at 1405. Thus, for instance, the "EPA could not sue to enforce the Water Pollution Control Act, where [the] same issue had been litigated in state court by the Washington Department of Ecology." *Id.* (summarizing *United States v. Rayonier, Inc.*, 627 F.2d 996 (9th Cir.1980)).

*Common Cause v. Jones* sought, and the current action seeks, to vindicate the rights of voters in California counties that use punch-card balloting. (Compl. ¶ 4, *Common Cause;* FAC ¶ 4.) In essence, the plaintiffs in both cases were and are acting in a representative capacity on behalf of not only their members, but all voters in the affected counties.

Moreover, there is little question that the additional Plaintiff in this case—the California NAACP—is closely aligned with the interests of the plaintiffs in the prior

case. First, it is noteworthy that all three Plaintiffs here, as in *Common Cause*, are represented by the ACLU Foundation of Southern California, and indeed by the same lead counsel, Mark D. Rosenbaum. Second, the stated mission of the California NAACP is particularly closely aligned with that of the Southern Christian Leadership Conference, a party to the first lawsuit. (*Compare* FAC ¶ 12 (NAACP mission is "to secure and protect the civil rights of people of color, including protecting the voting rights of African Americans") *with* Compl. ¶ 9, *Common Cause v. Jones* (SCLC works "to promote the full equality of African Americans and other minority groups in all aspects of American life, including voting, elections, and political participation").)

Finally, Plaintiffs have not disputed that there is an identity of parties in this case. Accordingly, while the Court need not decide the res judicata issue at this juncture, there is ample reason to believe that Plaintiffs will have a difficult time overcoming it.

*2. Laches*

■■ Under the equitable doctrine of laches, the Court may deny an injunction to a plaintiff who fails diligently to assert his claim. "Laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Costello v. United States*, 365 U.S. 265, 282, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961) (citations omitted); *see also Nat. R.R. Passenger Corp. (Amtrak) v. Morgan*, 536 U.S. 101, 121–22, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); *Soules v. Kauaians*

---

**2.** At oral argument, Plaintiffs' counsel moved in the alternative for relief from the Consent Decree and Judgment in *Common Cause*, pursuant to Fed.R.Civ.P. 60(b). For essentially the same reasons stated above, the Court would be inclined to deny such a motion if brought in the *Common Cause* litigation. Because the motion was improperly made in this case, and not in the separate *Common Cause* suit, however, it must be, and hereby is, DENIED.

*for Nukolii Campaign Committee,* 849 F.2d 1176, 1180 n. 7 (9th Cir.1988).

■ Here, Plaintiffs waited almost two years to reassert their claims with full knowledge that, until replacement of the punch-card machines in March of 2004, other elections would take place. On the eve of this election, Plaintiffs have suddenly rediscovered "the malfunctioning machine of our democracy" that will render this election "a sham." (Memo. in Supp. of Ex Parte Application at 1.) Yet Plaintiffs were apparently content with the malfunctioning machine when they faced, and presumably participated in, recent elections. Most significantly, the 2002 primary and general elections came and went without Plaintiffs at any time asserting these claims or calling for injunctive relief.

Plaintiffs argue that they forewent injunctive relief with respect to the 2002 elections because the public interest in holding those elections was of a much greater magnitude than that at issue here given the number of expiring state office terms, and the need to elect a congressional delegation. The comparative interests in holding this election are discussed *infra.* The Court notes, however, that whatever Plaintiffs' reasons for not challenging the 2002 election, it is still the case that the *Common Cause* plaintiffs proposed 2004— not 2003—as the year for punch-card phase-out, with full actual or constructive knowledge that special elections were a possibility. Indeed, it was only after the recall election had been certified and a date set that Plaintiffs finally decided to reassert their claims.

The potential prejudice to the State of California is clear. The State is in the process of updating its voting machinery consistent with the deadline imposed by the Consent Decree in *Common Cause.* The State relied on the Consent Decree and could have attempted to update the voting machines sooner if made aware of

Plaintiffs' continuing challenge. The date currently set for the recall election is mandated under the California Constitution, and any injunction against so proceeding would bear strongly upon the State's interest in complying with its laws and effecting the will of its people.

As with the question of res judicata, while the Court need not decide the defense of laches at this point in the litigation, it clearly poses a significant impediment to the prosecution of this suit. *Cf. Knox v. Milwaukee County Board of Elections Commissioners,* 581 F.Supp. 399, 402–04 (E.D.Wis.1984) (refusing to enjoin an upcoming election because plaintiff's claim was wholly barred by the doctrine of laches).

### 3. *Substantive Claims*

Even if the Court could reach the substance of Plaintiffs' constitutional and statutory claims, Plaintiffs have failed to prove a likelihood of success on the merits with regard to both their equal protection and Voting Rights Act claims.

While the Court assumes that Plaintiffs can show a likelihood that the punch-card machines will suffer a higher error rate than other technologies, the Court concludes that Plaintiffs are not likely to prevail on the merits of their claims.

#### a. *Alleged Error Rates*

It is disputed whether punch-card balloting is guaranteed to produce a higher "error rate" than other technologies. It is possible, for instance, to conjure explanations other than machine error for a residual vote rate, including affirmative decisions by voters not to vote in particular races or on particular issues. Indeed, Intervenor Ted Costa argues (with expert support) that the former is a significant factor in the differential residual vote rates. Costa argues that some other tech-

nologies actually prevent intentional non-votes, and thus dramatically lower the incidence of residual votes. In some contrast, the Secretary of State concedes that punch-card machines are "antiquated" and does not squarely dispute Plaintiffs' fundamental allegations of higher error rates. (Def.'s Opp. at 1–2.)

The Secretary of State does argue, however, that he will be undertaking extensive voter education efforts that could have the effect of lowering the residual rate in the forthcoming election. Thus, he maintains, it would be entirely speculative to conclude that higher residual vote rates will necessarily afflict punch-card balloting in the upcoming election. (Of course, the public was certainly conscious of punch-card machines and their defects following the 2000 presidential election, and yet these machines appear to have experienced a disproportionately high residual vote rate in the 2002 California elections.)

In any case, even assuming that Plaintiffs can show a likelihood that punch-card machines will evidence a higher rate of erroneously uncounted ballots—a finding the Court does not make at this time [3]— Plaintiffs' claims still are not likely to succeed. This is true because, even if Plaintiffs can show disparate treatment in this regard, the Court concludes that such would not amount to illegal or unconstitutional treatment.

b. *Equal Protection Claim*

It is, of course, "beyond cavil that voting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 432, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (citation and internal quotation marks omitted). And as a general proposition, governmental infringements of fundamental constitutional rights are subject to close judicial

scrutiny. *See, e.g., Dunn v. Blumstein*, 405 U.S. 330, 336–39, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

However, election laws, even those affecting the "voting process itself," "will invariably impose some burden upon individual voters." *Burdick*, 504 U.S. at 433, 112 S.Ct. 2059. Accordingly, a flexible standard has been applied by the Supreme Court in voting rights cases, under which a court "must weigh the character and magnitude of the asserted injury ... against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059. While strict scrutiny is applied to "severe" restrictions on the exercise of the franchise, "the State's important regulatory interests are generally sufficient to justify" "reasonable, nondiscriminatory restrictions" on the right to vote. *Id.; accord Anderson v. Celebrezze*, 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983).

Indeed, this two-tiered analysis has been a consistent feature of the Court's voting rights cases. Plaintiffs introduce their First Amended Complaint with an invocation of the "one-person, one-vote principle that lies at the heart of our democracy." (FAC ¶ 3.) This is a reference to the Supreme Court's landmark apportionment cases, including *Gray v. Sanders*, 372 U.S. 368, 381, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), *Reynolds v. Sims*, 377 U.S. 533, 558, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and their progeny. While intentional geographic segregation of voters—which may work to dilute vote weight on the basis of residence—was subject in those cases to exacting judicial scrutiny, the Court realized the limitations of its decisions. Acknowledging that precise mathematical equality was likely to be elusive, the *Reyn-*

**3.** The Court declines Plaintiffs' invitation to hold an evidentiary hearing on this issue, as

the factual inquiry contemplated is mooted by the Court's holding.

*olds* Court specifically noted that "[s]o long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible . . . ." 377 U.S. at 579, 84 S.Ct. 1362.

Thus, from *Reynolds* through *Burdick*, the Supreme Court has suggested that marginal deviations from precise vote equality, and minor burdens on the right to vote, will be subject to rational basis review so long as they reflect "legitimate [governmental] considerations," *Reynolds*, 377 U.S. at 579, 84 S.Ct. 1362, or are "reasonable nondiscriminatory restrictions," *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059.

Indeed, in *Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000)— which did not involve allegations of illegitimate motivation or voter classification— the Supreme Court strongly hinted that rational basis review might be appropriate to claims of marginally disparate error rates among varying voting technologies. In that case, which challenged the standards imposed in connection with a court-ordered recount of machine-case ballots, the Court eschewed an explicit standard of review. In striking down the recount procedure as violative of equal protection, however, the per curiam opinion repeatedly couched its decision in language evocative of rational basis review. *See, e.g., Bush*, 531 U.S. at 104–05, 121 S.Ct. 525 (explaining that, having once granted the vote on equal terms, a State may not, "by later arbitrary and disparate treatment, value one person's vote over that of another"); *id.* at 105, 121 S.Ct. 525 ("[T]he question before us . . . is whether the recount procedures the Florida Supreme Court has adopted are consistent with its obligation to avoid arbitrary and disparate treatment of the members of the elector-

ate."); *id.* ("[T]he recount mechanisms . . . do not satisfy the minimum requirement for nonarbitrary treatment of voters.").

If rational basis review applies, the State might well be able to adduce sufficient justifications for the use of punch-card balloting machines. *See, e.g., Bush*, 531 U.S. at 134, 121 S.Ct. 525 (Souter, J., dissenting) ("[E]ven though different mechanisms [within a jurisdiction] will have different levels of effectiveness in recording voters' intentions[,] local variety can be justified by concerns about cost, the potential value of innovation, and so on."); Richard L. Hasen, *"Bush v. Gore* and the Future of Equal Protection Law in Elections,"* 29 Fla. St. U.L.Rev. 377, 395–96 (2001).

As this Court noted in *Common Cause v. Jones*, however, it is possible to read *Bush* as implying, or at least employing, an elevated standard of review. *See Common Cause v. Jones*, 213 F.Supp.2d 1106, 1109 (C.D.Cal.2001). To the extent that the use of such a standard would be in tension with the Supreme Court's prior voting rights jurisprudence, there are many reasons to believe that the *Bush* Court's analysis was limited to its unique context.

For instance, the Court concluded that the challenged recount process was "inconsistent with the minimum procedures necessary to protect the fundamental right of each voter in the *special instance* of a statewide recount under the authority of a single state judicial officer." 531 U.S. at 109, 121 S.Ct. 525 (emphasis added). Indeed, the Court continued, "[o]ur consideration is limited to the present circumstances, for the problem of equal protection in election processes generally presents many complexities . . . . The question before the Court is not whether local entities, in the exercise of their ex-

pertise, may develop different systems for implementing elections." *Id.; see also Spears v. Stewart,* 283 F.3d 992, 996 (9th Cir.2002) (Reinhardt, J., dissenting) (suggesting majority's rule is like that of *Bush:* "good for this case and this case only"); *Sorchini v. City of Covina,* 250 F.3d 706, 709 n. 1 (9th Cir.2001) (per curiam, Kozinski, Tallman, Zapata, JJ.) (citing *Bush* for proposition that particular argument is persuasive "only in this case").

Regardless, this Court, specifically did not decide in *Common Cause* what standard of review would apply to a challenge levied against the certification of punch-card voting machines with disproportionately high error rates. *See Common Cause,* 213 F.Supp.2d at 1109. It need not do so here.

■ Plaintiffs in this case bring a far narrower subset of the challenge that was brought in *Common Cause.* The plaintiffs in the earlier suit challenged the Secretary of State's decision to certify punch-card machines for use in California. In other words, they contested the use of punch-card machines *in general.* Had that case gone to trial, the State would have been required to demonstrate sufficient justifications for the use of punch card machines *in general.*

Since that suit was brought, however, the Secretary of State has decertified punch-card machines effective March 2004. Plaintiffs in this case do not—indeed, cannot—challenge the use of punch-card machines generally, but rather contest their use *in this election.* Thus, even if the Court were to reach the merits of Plaintiffs' equal protection claim, the State would not be obligated to justify the use of punch-card machines as a general means of gauging voter preference. Rather, the State would merely need to adduce sufficient justifications for their use *in this election.*

That, the State undoubtedly can do. Alternative technologies will not be available in several of the affected counties in time for the October election. Because the State cannot under its own constitution conduct the election later than the date currently set, and short of a court order compelling something different, the State's choice is between using punch-card machines in several counties and using nothing at all in those counties. The State clearly has a compelling interest in not disenfranchising the voters of at least six counties, and the limited use of punch-card voting in this election is a narrowly tailored means to achieve that end. Accordingly, whatever the appropriate standard of review, Plaintiffs are unlikely to succeed on the merits of their constitutional claim.

c. *Voting Rights Act*

Plaintiffs allege that punch-card machines are used in counties with disproportionately large minority populations, and thus that the machines' allegedly higher error rate "results in a denial or abridgement of the right ... to vote on account of race or color," in violation of Section 2(a) of the Voting Rights Act (codified at 42 U.S.C. § 1973(a)).

While Plaintiffs accurately state the general rule of Section 2(a), they seem to ignore Section 2(b), which provides an analytical framework for determining whether that rule has been violated:

A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected class] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered ....

42 U.S.C. § 1973(b); *see Gingles*, 478 U.S. at 43, 106 S.Ct. 2752.

As that Section reflects, "[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47, 106 S.Ct. 2752; *accord Voinovich v. Quilter*, 507 U.S. 146, 153, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993). Thus, the express intent of the Voting Rights Act is to combat electoral structures and procedures that deprive minority voters of an opportunity to participate effectively in the political process. *See Gingles*, 478 U.S. at 44, 106 S.Ct. 2752.

Indeed, the Senate Report accompanying the 1982 amendments to the Voting Rights Act lists a number of additional factors that may inform the Section 2 analysis, and which confirm the Section's central purpose. These include: a history of official discrimination in the jurisdiction; racially polarized voting; the lingering effects of prior discrimination; a lack of electoral success among minority candidates; the comparative unresponsiveness of elected officials to the needs of minorities; and, whether the policy justification for the challenged practice is "tenuous." *Gingles*, 478 U.S. at 37, 106 S.Ct. 2752 (citing Sen. Jud. Comm. Maj. Rep., at 28–

29, U.S.Code Cong. & Admin. News 1982, pp 206–207).[4]

■■■ There is little about the violation alleged here that would suggest it is of the type contemplated by Section 2 of the Voting Rights Act. Plaintiffs contend that the affected counties have average minority populations that are 15% larger than counties using other voting technologies, and that the punch-card machines in the affected counties have a residual vote rate of 2.23%, as compared to an average residual vote rate of approximately 1% in other localities. This is not a situation where, for instance, punch-card machines are alleged to be used only in minority-majority precincts, or where the error rate is so high as to consistently disable minority voters from electing their candidates of choice. Nor have Plaintiffs argued that historical discrimination or present animus, together with the lingering effects of prior discrimination, somehow combine to exacerbate the effect of this particular practice vis-à-vis minority voters. Nor do Plaintiffs even allege that punch-card machines are intended to limit, or have the effect of limiting, the ability of minority voters to participate effectively as members of the electorate, or have rendered office-holders comparatively less responsive to minority voters.

Indeed, of the approximately dozen relevant factors contained in the Senate Report and Section 2 itself, Plaintiffs cite but one (from the Senate Report): that the state's justification for use of the challenged practice is "tenuous." *Gingles*, 478 U.S. at 45, 106 S.Ct. 2752 (citing S. Rep. at

**4.** While the reasoning from *Gingles* is apt, as the Court noted in the *Common Cause* litigation, the separate three-part test provided by that case and referred to by Plaintiffs is not applicable here, as it was specifically geared to the context of legislative apportionment in which *Gingles* arose. 213 F.Supp.2d at 1110. However, the fact that Section 2 has been invoked primarily to challenge certain types of legislative districts merely reinforces the Court's conclusion that Section 2 is targeted principally to electoral procedures and practices that have the effect of impairing the participation of minorities in the electoral process.

29); (Pls.' Compl. at 18–19; Reply at 13–15). While the Senate Report notes that this factor "may have probative value," *Gingles,* 478 U.S. at 45, 106 S.Ct. 2752 (citing S. Rep. at 29), it is certainly not dispositive in the absence of *any other evidence or allegations* that would tend to prove Plaintiffs' Section 2 claim.

In sum, Plaintiffs suggest a Voting Rights Act violation based exclusively upon the alleged error rate of machines that poll "majority" as well as minority voters, and are used in counties containing nearly one-half of California's voters. They contend that some 40,000 votes may be lost as a result of higher error rates (many if not most of which votes will be cast by non-minority voters) in a state of nearly eight million voters. Accordingly, there is, at best, a slim chance that Plaintiffs will be able to prove that punch-card machines in California "interact[ ] with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles,* 478 U.S. at 47, 106 S.Ct. 2752; *accord Voinovich,* 507 U.S. at 153, 113 S.Ct. 1149.

While Plaintiffs' Section 2 allegations suffice to state a claim under the liberal federal pleading rules,[5] injunctive relief is warranted only where Plaintiffs can show a *probability* of success on the merits, or at least that there are *substantial questions* as to the merits. In light of the allegations and record before the Court, Plaintiffs have failed to make such a showing.

### B. Irreparable Injury

■ "Abridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury." *Cardona*

*v. Oakland Unified School District,* 785 F.Supp. 837, 840 (N.D.Cal.1992) (citations omitted). There is some question, however, whether Plaintiffs can establish that punch-card balloting's higher residual vote rate actually reflects a higher error rate, and therefore will injure Plaintiffs in the way they allege. Nonetheless, as the Court cannot envision an effective remedy that would be available to Plaintiffs after the votes have been cast, it assumes for purposes of this analysis that the alleged injury would be irreparable.

### C. Balance of Hardships

■ Even assuming the above analysis suggests a serious question on the merits (which it does not), the balance of hardships weighs heavily in favor of allowing the election to proceed.

Here, the Court must balance the potential hardship to Plaintiffs (namely, the risk of having their votes diluted or denied through use of punch-card balloting), against the hardship to the State of California if the injunction is granted (i.e., canceling or postponing its scheduled election). Because the hardships implicated in this case are, in essence, both matters of public concern, the Court turns to the public interest prong of the analysis.

### D. Public Interest

The public interest factor is particularly important in a case such as this, where the plaintiff seeks to enjoin an election. *See Cano v. Davis,* 191 F.Supp.2d 1135, 1139 (C.D.Cal.2001) (decided by a three-judge panel, which included Circuit Judge Reinhardt); *Cardona,* 785 F.Supp. at 842. "Because the conduct of elections is so essential to a state's political self-determi-

---

5. *See Common Cause,* 213 F.Supp.2d at 1110; *Black v. McGuffage,* 209 F.Supp.2d 889, 897 (N.D.Ill.2002) (concluding that viability of Section 2 claim in similar punch-card ballot-ing case "cannot be fully ascertained in this case except through discovery and possibly trial").

nation, the strong public interest in having elections go forward generally weighs heavily against an injunction that would postpone an upcoming election." *Cano,* 191 F.Supp.2d at 1139 (citations omitted). The *Cano* court explained that "enjoining an election is an extraordinary remedy involving a far-reaching power, [citation], which is almost never exercised by federal courts prior to a determination on the merits...." *Id.* at 1137; *see also Diaz v. Silver,* 932 F.Supp. 462, 465 (E.D.N.Y. 1996) (decided by three-judge panel, which included Circuit Judge McLauglin) ("[A] preliminary injunction enjoining an election is an extraordinary remedy involving the exercise of a very far-reaching power.").[6]

In *Reynolds v. Sims,* the Supreme Court explained:

[U]nder certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding relief, a court is entitled to and should consider the proximity of the forthcoming election and the me-

chanics and complexities of state election laws, and should act and rely upon general equitable principles.

377 U.S. 533, 585, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

■ Relying in part on this principle, the courts in both *Cano* and *Cardona* refused to issue injunctions despite potentially meritorious challenges. As in those cases, allowing this election to go forward in October is "essential to [the] state's political self-determination." *Cano,* 191 F.Supp.2d at 1139. The recall is an unprecedented event, which directly reflects the will of the people of California. Delaying the election for half a year beyond the date set pursuant to the California Constitution undoubtedly works against the public interest implicit in a recall election.

In addition, where " 'the possibility of corrective relief at a later date exists, even an established [Voting Rights Act] violation does not in and of itself merit a preliminary injunction.' " *Diaz,* 932 F.Supp. at 468 (quoting *Watkins v. Mabus,* 771 F.Supp. 789, 805 n. 16 (S.D.Miss.1991) (citation omitted), *aff'd in part and vacated in part on other grounds,* 502 U.S. 954, 112 S.Ct. 412, 116 L.Ed.2d 433 (1991)). Here, the allegedly unlawful use of punchcard balloting is being remedied pursuant

---

**6.** To support their proposition that this Court may enjoin the forthcoming election, Plaintiffs point almost exclusively to cases involving judicial elections that were enjoined for failure to comply with the preclearance requirements of Section 5 of the Voting Rights Act. *See, e.g., Clark v. Roemer,* 500 U.S. 646, 111 S.Ct. 2096, 114 L.Ed.2d 691 (1991).

That context is distinguishable in material respects. First, an alleged Section 5 violation presents a single, clear-cut issue: whether or not a regulated jurisdiction has obtained preclearance before conducting an election. If such preclearance has not been sought or granted, a court may easily determine that the merits are likely to be resolved in a plaintiff's favor.

Second, and most significantly, Section 5 provides the district court with little discretion and does not mandate the balancing of equitable factors required here. *See Lopez v. Monterey County,* 519 U.S. 9, 23, 117 S.Ct. 340, 136 L.Ed.2d 273 (1996); *Haith v. Martin,* 618 F.Supp. 410, 414 (E.D.N.C.1985).

Third, every case cited by Plaintiffs in which a court enjoined an election arose in the context of a *judicial* election. The Court notes that the policy factors implicated by enjoining the October 7 election (discussed herein) are likely far different than those at issue in judicial elections.

to the *Common Cause* Consent Decree. Indeed, the March 2004 decertification date was proposed by plaintiffs in the prior litigation, and has been unchallenged since the Consent Decree was signed. Had the *Common Cause* plaintiffs preferred the Court reach the merits of their claims and, if successful, award the necessary remedy or remedies, they could have sought an adjudication on the merits. If plaintiffs had prevailed, the Court might well have ordered an earlier phase-out date, or enjoined certain elections. But "[t]his Court should not impose the significant costs of delaying an election when Plaintiffs, with nearly a year in which to seek a hearing on the merits, have done so only now that the election machinery is in gear." *Cardona*, 785 F.Supp. at 843; *see also United States v. Upper San Gabriel Valley Municipal Water District*, 2000 WL 33254228, *2, 2000 U.S. Dist. LEXIS 13353, at *6–*10 (C.D.Cal. Sep. 8, 2000); *Banks v. Board of Education*, 659 F.Supp. 394, 399 (C.D.Ill. 1987).

Further, there is some question whether the remedy contemplated would even have the effect Plaintiffs seek. Plaintiffs ask the Court to postpone the recall and ballot initiative votes until alternative voting mechanisms are in place. Yet if such relief were ordered, the State would be in an untenable position: it would be forced either to conduct the election outside the time frame required by the California Constitution, or to cancel the election to avoid that predicament. Clearly, the public interests in avoiding wholesale disenfranchisement, and/or not plunging the State into a constitutional crisis, weigh heavily against enjoining the election.

Moreover, even if the election could somehow be conducted at a later date, it is relevant in the public interest analysis to consider whether such a delayed election would not itself work strongly against the voting rights of all Californians. Because an election reflects a unique moment in time, the Court is skeptical that an election held months after its scheduled date can in any sense be said to be the same election. In ordering the contemplated remedy, the Court would prevent all registered voters from participating in an election scheduled in accordance with the California Constitution. Arguably, then, the Court by granting the relief sought could engender a far greater abridgement of the right to vote than it would by denying that relief.

Furthermore, the recall election in particular is an extraordinary—and in this case, unprecedented—exercise of public sentiment. Implicit in a recall election, and explicit in the time frame provided by the California Constitution, is a strong public interest in promptly determining whether a particular elected official should remain in office.[7]

Accordingly, the public interest in going forward with the scheduled election, including the gubernatorial recall and ballot

---

7. Although Plaintiffs make glancing references to the ballot initiatives, they have not developed any substantial legal or evidentiary basis to support a delay in votes on those initiatives. Rather, their arguments are directed almost wholly to the recall election, and Plaintiffs have made little or no effort to explain why an injunction would be warranted in one case and not the other.

Moreover, while some of the Court's analysis pertains specifically to the recall election, much of it—including that regarding the merits of Plaintiffs' constitutional and statutory claims, and the public interest against enjoining scheduled elections—applies with equal force to the currently-scheduled ballot initiatives. To the extent it is not explicit elsewhere in this Order, the Court concludes that Plaintiffs have not met their burden of showing that an injunction is warranted with respect to the ballot initiatives, nor have they convinced the Court that the public interest mandates injunctive relief.

initiatives, strongly favors denial of the preliminary injunction.

## V. CONCLUSION

Therefore, because Plaintiffs have failed to meet their burden in showing that injunctive relief is warranted, Plaintiffs' Motion for Preliminary Injunction (consolidated with Plaintiffs' Ex Parte Application for Temporary Restraining Order) must be, and hereby is, DENIED.

IT IS SO ORDERED.